**UNITED STATES of America, Plaintiff,**

v.

**Russell W. BARRETT et al., Defendants. No. 69–10–P.**

United States District Court, N. D. West Virginia. July 10, 1970.

Paul C. Camilletti, U. S. Atty., Wheeling, W. Va., for plaintiff.

William Bruce Hoff, Benjamin J. Parker, Charles H. Rudolph, Jr., J. Fred Earley, Parkersburg, W. Va., for defendants.

MAXWELL, Chief Judge.

On April 25, 1967, the City Council of Parkersburg, West Virginia, noting that a need existed within the city for low income housing, adopted a resolution calling for the creation of a local housing authority. The following day, the Mayor of Parkersburg created by proclamation the Parkersburg Housing Authority which consisted of five Commissioners who were appointed by the Mayor, the city's chief executive officer.

Prior to this formal action of the Mayor and City Council, the City of Parkersburg had consulted extensively with the United States Housing Authority of the Department of Housing and Urban Development.

On January 2, 1968, the City of Parkersburg entered into a "Cooperation Agreement," wherein the Parkersburg Housing Authority agreed to begin negotiations with HUD for loans and contributions toward the erection of three hundred units of low rent housing, and the city consented to undertake certain obligations and to waive other rights should the project be initiated.[1]

Next, the Parkersburg Housing Authority chose Theodore Morlang as the individual who would serve as developer and ultimately sell the project to the

1. In the Cooperation Agreement Parkersburg covenanted, among other things, to accept annual payments from the local authority in lieu of taxes; to make reasonable changes in zoning laws to accommodate the proposed project; to accept dedication of all passageways and sewage mains within the project; and to eliminate a number of slum dwellings in blighted areas equal to the number of living units constructed by the local authority.

Parkersburg Housing Authority. Finally, on June 19, 1968, the Parkersburg Housing Authority entered into an Annual Contributions Contract with the United States Housing Authority. This contract, many pages in length, defined in great detail the cooperative effort to which the parties were dedicated. Immediately prior to the execution of this Annual Contributions Contract, and up to the present moment, there has been a great deal of controversy over the actions of the Parkersburg Housing Authority, particularly as to their selection of a site for the proposed development.

On July 19, 1968, Russell W. Barrett and sixty-one co-plaintiffs, all of whom allegedly then resided within the statutory "area of operation" of the proposed housing development [2] sued in the Circuit Court of Wood County, West Virginia, for a declaratory judgment that would, in effect, prohibit completion of the housing development. Named as defendants in the suit were the City of Parkersburg, the Parkersburg Housing Authority, members of the local authority and their appointees, individually, and Theodore Morlang, the developer and vendor selected by the Parkersburg Housing Authority.

After the institution of the state court action in Wood County, the United States Housing Authority demanded an assignment of the Parkersburg Housing Authority's interest in the proposed development under Part I, Section 12(C) of the Annual Contributions Contract. This last mentioned clause, which will be later discussed in greater detail, provided that should the right of the Parkersburg Housing Authority to contract for the development of the housing project be questioned in any legal proceeding, a substantial default would occur thus entitling the United States to demand and obtain an assignment of the local authority's rights in the development. After the assignment became a reality, Morlang formally attorned to the United States.

Finally, the United States instituted the present action in this Court to enjoin prosecution of the state court action in Wood County which, allegedly, is severely hampering the obtaining of private capital for the venture.

Russell W. Barrett and the citizens from Parkersburg, defendants herein, have raised four issues. First, that the contract between the Parkersburg Housing Authority and the United States is void, because the contracting party for the United States was the Public Housing Administration, a defunct agency, and not the United States Housing Authority. This first point was raised and subsequently rejected in a motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, but may, of course, properly be raised and considered again in defendants' answer. Secondly, the defendants maintain that the Parkersburg Housing Authority lacks corporate existence, *de jure* or *de facto*, under W.Va.Code §§ 16–15–1 to –6 (Michie 1966).[3] Thirdly, defendants al-

---

2. The "area of operation" constituted the City of Parkersburg and all areas within five miles of the city line exclusive of land belonging to any other municipality. The term "area of operation" is defined in W.Va.Code § 16–15–1a (Michie Supp. 1969).

3. Candidly stated, defendants argue as follows: In 1937 the City of Parkersburg acting pursuant to the provisions of Chapter 93, Acts of the Legislature of West Virginia, Second Extraordinary Session, 1933, created the Parkersburg, *West Virginia* Housing Authority. Although the latest date that the Parkersburg, *West*

*Virginia* Housing Authority could have retained its full complement of members was December 20, 1943, the first local authority was never disbanded.

In 1941, however, the West Virginia Legislature enacted what is now W.Va. Code § 16–15–3 (Michie 1966) *creating* local housing authorities in each city and county of West Virginia which, unlike Parkersburg, did not have a housing authority under the earlier legislation. Where local housing authorities pre-existed the 1941 legislation, those agencies were recognized. Those local authorities which were *created* by the 1941 legislation, however, could not function until

lege that because of procedural irregularities incidental to its meeting and the illegal delegation of authority, decisions of the Parkersburg Housing Authority on the development at issue are voidable if not void.[4] The second and third issues are at the heart of the case now pending before the Circuit Court of Wood County. Finally, defendants attack the default provision in the contract between the United States Housing Authority and the Parkersburg Housing Authority under which the United States demanded and received an assignment of the local authority's rights.

■ Of the original sixty-two defendants, two parties, Harry G. Morehead and Evelyn Morehead, are presently unrepresented by counsel. Because they have not been dismissed from this case, they are bound as parties by the decision of the Court in this case.

The City of Parkersburg and the Parkersburg Housing Authority moved to be dismissed from this action on the grounds that there is no cause of action

alleged against them or that they are merely "incidental parties." The city and the local housing authority were ordered joined earlier upon the motion of the individual defendants who thought such joinder proper under Rule 19(a) of the Federal Rules of Civil Procedure. Rule 19(a) reads:

(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed inter-

---

*activated* by the appointment of commissioners.

Defendants urge that in 1967, the Mayor and City Council of Parkersburg, either forgetting or ignoring the Parkersburg, *West Virginia* Housing Authority, dormant for almost a quarter of a century, "activated" the local authority supposedly "created" by the 1941 legislation. Defendants further insist, as noted above, that the 1941 legislation did not create a housing authority in Parkersburg which could be subsequently activated. Therefore, defendants argue, since Parkersburg could not activate a nullity, the Parkersburg Housing Authority has no basis in law.

4. Defendants raised the following issues, among others, by their complaint in the Wood County litigation: (Only some of the allegations have been raised by answer before this Court, but they are listed because the Wood County Circuit Court complaint constitutes Defendants' Exhibit A here, and defendants appeared to rely on many of these issues at the several oral arguments before this Court).

(1) By-laws were adopted before the Commissioners took their oaths of office.

(2) The Cooperation Agreement between the Parkersburg Housing Authority and

the United States was a canned legal document provided by the United States Housing Authority, and signed by the local authority without meaningful discussion of the same.

(3) The Parkersburg Housing Authority delegated to its Chairman the power to enter into the contract of sale with Morlang, at a time when the contract hadn't been seen by the individual members of the authority.

(4) The Parkersburg Housing Authority allowed Morlang himself to choose the site of the project, thus delegating a nondelegable power.

(5) In a meeting of June 15, 1967, the Parkersburg Housing Authority adopted a policy of non-disclosure in regard to its activities, which policy was maintained until the eve the Annual Contributions Contract was to be signed, when the story was revealed by a newspaper reporter.

Regardless of the ultimate legal effect of the noted irregularities, the Court should note its disapproval, particularly of the secrecy, which so evidently shrouded deliberations and activities of the authority. The local authority and its spokesmen have been noticeably reluctant to appear before the Court in this case.

est. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

In measuring the interest of the Parkersburg Housing Authority against the standards of Rule 19(a), the Court first notes that the local authority made the assignment to the United States after institution of the litigation in the Circuit Court of Wood County. Issues to be decided which should or could affect the Parkersburg Housing Authority therefore are: (1) the validity of the assignment, and (2) the local authority's vulnerability to the state court suit in Wood County.

■ Generally, where the "validity" of the assignment is in question, the assignor is deemed to be an indispensable party. Respectable authority, decided before the advent of the federal rules, supports this view. Brown v. Fletcher, 231 F. 92 (2d Cir. 1916); Hubbard v. Manhattan Trust Co., 87 F. 51 (2d Cir. 1898).

■ The validity of the assignment here is decidedly in question. The Court recognizes that the Parkersburg Housing Authority supports the validity of the assignment so that work can proceed on the housing project under federal sponsorship. On the other hand, a void assignment or the continued maintenance of the state court suit in Wood County would have an adverse effect upon the future of the local authority. Under these circumstances the Parkersburg Housing Authority is a valid party. In addition, a decision of the Court either enjoining or refusing to enjoin the litigation in the state court would affect the ability of the Parkersburg Housing Authority to cure the "substantial default" and regain control over the proj-

ect pursuant to 42 U.S.C.A. § 1421a(a) (2). For these reasons, this Court believes that the Parkersburg Housing Authority should be joined because it "claims an interest relating to the subject of the action and is so situated that the disposition of the action * * * [its] absence may * * * as a practical matter impede * * * [its] ability to protect that interest."

■ The City of Parkersburg is, of course, intimately involved in the Wood County litigation. Mayor Dean T. Jackson entered into the Cooperation Agreement with the Parkersburg Housing Authority. In the Cooperation Agreement the city covenanted many acts which would ease the erection of the housing project in question.[5] Clause 9 of the Cooperation Agreement also provided in part:

"The privileges and obligations of the Local Government hereunder shall remain in full force and effect with respect to each Project so long as the beneficial title to such project is held by the Local Authority or any such other public body or governmental agency, including HUD, authorized by law to engage in the development or administration of low rent Housing Projects. If at any time the beneficial title to, or possession of, any Project is held by such other public body or governmental agency, including HUD, the provisions hereof shall inure to the benefit of and may be enforced by, such other public body or governmental agency including HUD." Defendants' Exhibit A at p. 22.

A grant of the requested injunction obligates the City of Parkersburg to the Department of Housing and Urban Development. On the other hand, a refusal to enjoin the state court action would see the city lose the benefit of the proposed low income housing project, at least for the immediate future. It is apparent that the city opposes the site selected for the housing project, and believes that the erection of the housing

---

5. See note 3 supra and accompanying text.

project would be contrary to the laws of West Virginia. Parkersburg has noted its opposition to the project in the Wood County civil action by way of a cross complaint against Morlang and the Parkersburg Housing Authority, supporting Russell W. Barrett's demand for a declaratory judgment.

Finally the Court notes the teaching found in Balter v. Ickes, 67 App.D.C. 112, 89 F.2d 856 (1937). In the *Balter* case, the City of St. Louis had covenanted with the United States to cooperate and furnish funds towards the erection of a war memorial. In a suit by private citizens seeking to enjoin the undertaking of the federal government, the Court held the city properly interested and an indispensable party to the litigation. The City of Parkersburg has an interest in the present dispute, which under Rule 19 of the Federal Rules of Civil Procedure renders it a party which should be joined, if feasible. Here such feasibility is obvious.

 Defendants maintain that, at the time the United States entered into the Annual Contributions Contract with the Parkersburg Housing Authority, the only federal body authorized to make such a contractual commitment with a local authority was the United States Housing Authority. The defendants urge that the contract clearly reflects that the federal party to the contract was the Public Housing Administration, then a defunct body.

Pub.L. 90–19, 81 Stat. 17, § 3, codified as 42 U.S.C.A. § 1403, and with an effective date of May 25, 1967, created the United States Housing Authority.[6] In addition, Pub.L. 90–19, 81 Stat. 17, deleted references to the "Public Housing Administration," and substituted the "United States Housing Authority," or the "Department of Housing and Urban Development."

The Annual Contributions Contract entered into between the Parkersburg Housing Authority and the United States has the following statement at the commencement of Part I of the contract:

THIS AGREEMENT, entered into as of the 19th day of June, 1968, (herein called "Date of This Contract") by and between the United States of America (herein sometimes called the Government and in Part Two hereof called "PHA") * * *

PHA as used within the Annual Contributions Contract is presumably an abbreviation for the Public Housing Administration.

Defendants' position, in its simplest terms, is a request that the Court designate the contract between the United States and the Parkersburg Housing Authority invalid, since the form contract used by the government did not reflect that the functions of the Public Housing Administration had been taken over by the United States Housing Authority.

The Court rejects this conclusion. The Public Housing Administration functioned under the Department of Housing and Urban Development before the enactment of Pub.L. 90–19. Pub.L. 90–19 was preeminently a housekeeping measure. House Report No. 214, 1 U.S. Code Cong. & Adm.News, pp. 1194–1195, 90th Cong., 1st Sess. 1967, is revealing.

The joint resolution amends Federal laws relating to housing and urban development to reflect the creation of the new Department of Housing and Urban Development and the transfer to the Secretary of the Department of the functions and powers previously vested in the Housing and Home Finance Agency and its constituent units and officials. It does not, in conforming the nomenclature used in those laws to the new administrative

6. The only subsequent amendment to 42 U.S.C.A. § 1403 occurred with the enactment of Pub.L. 90–448, 82 Stat. 476, § 1719(a) which deleted the words, "a body corporate of perpetual duration to be known as," from the first sentence of 42 U.S.C.A. § 1403.

structure, make any substantive changes in programs administered by the Department or authorize any new functions or programs. The names of organizations and officials in the various statutes relating to housing and urban development are simply changed so that they will conform to the names established by the Department of Housing and Urban Development.

\*　　\*　　\*　　\*　　\*　　\*

The Department of Housing and Urban Development Act, Public Law 89–174, approved September 9, 1965, established the Department of Housing and Urban Development effective November 9, 1965. The Act transferred to and vested in the Secretary all of the functions, powers, and duties of the Housing and Home Finance Agency, of the Federal Housing Administration in that Agency, and the heads and other officers and offices of those agencies.

House Report No. 214 also includes a copy of a written communication from former HUD Secretary Robert C. Weaver to Congressman Wright Patman. The letter, too, is considered "legislative history." The letter says in part:

The joint resolution is entirely technical and includes no substantive provision whatsoever. It would merely correct the names of organizations and officials in the various statutes relating to housing and urban development so that they will conform to the names as already established by law in the Department of Housing and Urban Development.

The mere change in name of a branch of an executive department, unreflected in a form contract, otherwise valid, entered into by that department and signed by the officer thereof, and which does not alter or change the expressed intentions of the contract terms and undertakings, or the standing of the contractual aims, should not be allowed to invalidate the contract.

As mentioned previously, defendants, invoking West Virginia law, allege first that the Parkersburg Housing Authority is a legal non-entity due to invalid incorporation and, secondly, that even if validly incorporated, the local authority's blatant disregard for required procedures and delegation of non-delegable powers renders contracts for erection of the housing development void.[7] Finally, defendants attack the default provision in the Annual Contributions Contract under which the United States Housing Authority demanded and received from the Parkersburg Housing Authority assignment of the local authority's rights.

Despite the final challenge grounded on federal law, it is clear that defendants rely primarily on state law. Regardless of the validity of the assignment, defendants feel that the United States Housing Authority, as assignee of the Parkersburg Housing Authority, is subject to all of its predecessor's infirmities. If the Parkersburg Housing Authority could not legally establish a housing project under West Virginia law, defendants reason, neither could its assignee establish or maintain the same.

The United States contends that the default provision in the Annual Contributions Contract has the support of federal statutes. Additionally, it maintains that, after the assignment took place, all matters of state law became moot. Further, the United States justifies the present action to enjoin the Wood County litigation since the state suit has hampered the efforts of Morlang, who attorned to the United States and is now its contractor, to obtain the preliminary financing necessary to institute significant construction.

 After careful examination of the pleadings and the briefs filed by both parties, and accepting the stipulations of the parties to the effect that no further factual inquiry is necessary and perceiving no factual controversies of material or significant issues under Rule 65 of the Federal Rules of Civil Proce-

---

7. See notes 3–4 supra and accompanying text.

dure, the Court is of the opinion that the contentions of the United States have a sound basis in law. In arriving at this final result, the Court first notes two secondary conclusions: (1) that 42 U.S.C.A. § 1421a, authorized the controverted default provision, and (2) that, after the United States took over the project, issues of state law did indeed become moot. In concluding that 42 U.S.C.A. § 1421a, authorized the default provision in the Annual Contributions Contract, we first must look to the congressional declaration of policy. Here the first section of the Federal Housing Act of 1937 connotes a sense of urgency which must not be lost upon the Court. The section reads in pertinent part:

> It is declared to be the policy of the United States to promote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban, rural nonfarm, and Indian areas, that are injurious to the health, safety, and morals of the citizens of the Nation.

42 U.S.C.A. § 1401. The purpose of the Housing Act of 1937 has been specifically ruled within the power of Congress to provide for the general welfare of the United States under Art. 1, § 8, cl. 1 of the United States Constitution. City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945).

In arriving at the conclusion that there is authority granted the United States Housing Authority to take over a local project, we note that defendants maintain that Chapter 8 of Title 42 contemplates a high degree of co-operation between the United States Housing Authority and local housing authorities. Their position is supported by the portion of 42 U.S.C.A. § 1401 quoted above and by the recent Supreme Court decision in Thorpe v. Housing Authority of

Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). However, 42 U.S. C.A. § 1421a evidences a strong congressional intent that the United States take over a project in difficulty. In the final analysis, 42 U.S.C.A. § 1421a demonstrates, it seems to this Court, that completion of a project already begun should receive priority over federal-state cooperation. 42 U.S.C.A. § 1421a(a) (1) reads:

> § 1421a. *Private financing—Sale of public housing agencies' bonds*

> To facilitate the enlistment of private capital through the sale by public housing agencies of their bonds and other obligations to others than the Authority, in financing low-rent housing projects, and to maintain the low-rent character of housing projects—

> *Contracts for annual contributions; terms and conditions*

> (a) Every contract for annual contributions (including contracts which amend or supersede contracts previously made) may provide that—

> (1) upon the occurrence of a substantial default in respect to the covenants or conditions to which the public housing agency is subject (as such substantial default shall be defined in such contract), the public housing agency shall be obligated at the option of the Authority, either to convey title in any case where, in the determination of the Authority (which determination shall be final and conclusive), such conveyance of title is necessary to achieve the purposes of this chapter, or to deliver possession to the Authority of the project, as then constituted, to which such contract relates: *Provided,* That such conveyance or delivery of title shall be subject to the rights of third parties vested pursuant to paragraph (9) of section 1415 of this title;

Particularly important is the parenthetical material within the statute. Substantial default is described "(as such substantial default shall be defined

in such contract)." Furthermore, where the United States Housing Authority deems a conveyance of title necessary to fulfil the aims of Chapter 8, Title 42 the section notes that the "(* * * determination shall be final and conclusive)". Thus, it appears that 42 U.S.C.A. § 1421a grants the United States Housing Authority wide discretion to define conditions which shall constitute a "substantial default" and to take quick, definitive action once such a default occurs.

In turning to the question of the federal agency's definition of a legal challenge to the municipal agency's authority as being a substantial breach was within the intent of Congress, we note the specific "substantial breach" at issue is contained in Part I, § 12(C) of the Annual Contributions Contract entered into between the federal and local housing authorities:

[i]f the Letter of Intent or Contract [with the developer] is held to be void, voidable or ultra vires, or if the power or right of the Local Authority to issue the Letter of Intent or enter into the Contract of Sale is drawn into question in any legal proceeding, [such an occurrence] * * * if the seller is not in default, shall constitute a Substantial Default for the purpose of Article V hereof and, in such case, the Government will continue the undertaking of the Project as the Local Authority may have and perform such Letter of Intent or Contract of Sale as the case may be.

One of the purposes of the substantial default provisions as established in the congressional enactment is, as noted above, "[t]o facilitate the enlistment of private capital through the sale by public housing agencies of their bonds and other obligations to others than the Authority * * *." 42 U.S.C.A. § 1421a. Obviously the existence of legal proceedings in the courts, challenging the corporate existence of a local housing agency, can constitute a bar to the procurement of private capital.

The Court believes that an examination of 42 U.S.C.A. § 1401 (setting forth the purpose of the Housing Act of 1937), and 42 U.S.C.A. § 1421a(a) (1) (the substantial default provision) demonstrates that the Wood County suit was such a "substantial default" within the intent of Congress. Nevertheless, the Court recognizes that the interpretation of 42 U.S.C.A. § 1421a by the United States Housing Authority is entitled to considerable weight.

Certainly there are limitations as to the manner in which a federal administrative agency can bind those with whom it deals. This Court subscribes to the principle enunciated by the District of Columbia Court of Appeals:

No administrative body has authority to contract with a regulated corporation in a manner contrary to the statute which is being administered, nor in a way which does not give effect to the intent of Congress.

People's Bank v. Eccles, 82 U.S.App.D.C. 126, 161 F.2d 636, 644 (1947), rev'd on other grounds, Eccles v. Peoples Bank, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784 (1948) (controversy not sufficiently ripe to warrant declaratory judgment.)

In a case very close to the instant litigation the Supreme Court declared:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." Unemployment [Compensation] Comm'n [of Territory of Alaska] v. Aragon, 329 U.S. 143, 153, [67 S.Ct. 245, 250, 91 L.Ed. 136]. See also, e.g., Gray v. Powell, 314 U.S. 402, [62 S.Ct. 326, 86 L.Ed. 301]; Universal Battery Co. v. United States, 281 U.S. 580, 583, [50 S.Ct. 422, 74 L.Ed. 1051]. "Particu-

larly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" Power Reator [Development] Co. v. [International Union of] Electric[al, Radio and Machine Workers], 367 U.S. 396, 408, [81 S.Ct. 1529, 1535, 6 L. Ed.2d 924].

Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The *Tallman* case involved the Secretary of the Interior's interpretation of an Executive Order as allowing oil and gas leases on federal lands. No regulation was at issue. Even more recently the Supreme Court supported the venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially where Congress has refused to alter the administrative construction. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). Zemel v. Rusk may be slightly distinguishable from the instant case in that the Secretary of State had interpreted the congressional statute on passports by way of departmental regulations. The principle of law enunciated above, however, bolsters earlier Supreme Court decisions to the effect that great weight must be given to the decision of an administrative body.

Finally, this Court notes the Supreme Court decision in Thorpe v. Housing Authority of Durham, 393 U.S. 268, 280–281, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). There the Court held that decisions made by the Department of Housing and Urban Development under the Chapter of Title 42 now under consideration, were within the bounds of due process where they were reasonably related to the purpose of the Act.[8]

In summation, the following factors have influenced this Court to rule the assignment from Parkersburg Housing Authority to the United States Housing Authority valid: (1) the urgency of the congressional mandate for the Housing Act of 1937 expressed in 42 U.S.C.A. § 1401; (2) the broad range of discretion given the United States Housing Authority in determining what constituted a substantial default under 42 U.S.C.A. § 1421a(a) (1); (3) the fact that the substantial breach in question has demonstrable relation to private financing as set forth in 42 U.S.C.A. § 1421a; and (4) the discretion courts traditionally recognize in the administrative interpretation of a statute affecting an agency.

The conclusion that the state law issues raised by defendant became moot after the United States Housing Authority assumed the project follows from what has been herein stated. The congressional sense of urgency which prompted enactment of the Housing Act of 1937, 42 U.S.C.A. § 1401 et seq., the congressional mandate allowing the United States Housing Authority to take over a local project, and the validity of the administrative interpretation should not require further discussion.

Defendants' proposition of law, that an assignee inherits all of the mistakes of his predecessor, makes eminently good sense. However, the Court points to the statement of the Fifth Circuit in United States v. LeMay, 322 F.2d 100, 102 (5th Cir.1963).

[A]nalogies, quite sound as a matter of general law, may not be applicable in passing upon the rights of parties who have participated in business transactions expressly authorized by Congress.

8. The Supreme Court held that the policy established by 42 U.S.C.A. § 1441 of "providing a decent home and a suitable living environment for every American Family," supported the "regulation" contained in a circular. The "regulation" required that the municipal administrators of federally financed low income housing give tenants notice of the reason for eviction.

The *LeMay* case involved an officer of a federally financed housing corporation accused of misappropriating funds. The Fifth Circuit held that the Federal Housing Authority as the holder of all preferred securities was a proper party to the civil action. The district court therefore had jurisdiction notwithstanding the lack of diversity. The Court noted that the holder of preferred stock would not normally be a proper party to the litigation, but that circumstances were changed by the Federal Housing Authority's interest in the matter.

In short, Congress has provided a mechanism whereby the United States Housing Authority can take over a faltering project where the financing of the project is in difficulty. It cannot be assumed that Congress intended the United States Housing Authority to remain vexed with the difficulties prompting the substitution of parties.

■ Finally, the Court would comment briefly on two secondary matters. First, the government may sue to enjoin interference with a project in the national interest, even where the interference is directed at a government contractor. Yearsley v. W. A. Ross Construction Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940); City of North Miami, Fla. v. Grant-Sholk Construction Co., 237 F.Supp. 573 (S.D.Fla.1965).

■ Secondly, defendants have suggested that, because there are issues of state law in the instant case, the state courts should have the first opportunity to interpret their statutes. See Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1966). The issue raised, therefore, is abstention, an area of federal law which possesses many varieties and has important ramifications in our system of dual sovereignties. See Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). However, the Court does not feel that the abstention doctrine has a place in this litigation. The Court does not here rule on the constitutionality of a state statute without benefit of the interpretation placed upon the statute by the state judiciary. *See, e.g.,* Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1966); Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, 77 S.Ct. 287, 1 L.Ed.2d 267 (1941). This Court says in this instance that federal as opposed to state law governs the litigation now before it. The state statutes in question appear constitutional, but under the circumstances presented here must bow to federal legislation. Additionally it does not appear and the Court does not believe that this decision in the instant case will seriously disrupt a complex state regulatory system. See Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■ The foregoing shall constitute this Court's findings of fact and conclusions of law in compliance with Rule 52, Federal Rules of Civil Procedure, and based upon the findings and conclusions herein an order will be entered under Rule 65, Federal Rules of Civil Procedure, granting the plaintiff, United States of America, a permanent injunction against the defendants named in this civil action, their officers, agents, servants, employees and attorneys, prohibiting them, jointly and severally, from proceeding further, either in a direct or an indirect manner, in a civil action entitled Russell W. Barrett, et al. v. Theodore D. Morlang, et al., Civil Action No. 9744, now pending in the Circuit Court of Wood County, West Virginia, and which state court action seeks state court relief affecting the federally involved public housing project discussed in this memorandum.