**DATA CONSULTANTS, INC. and Gary R. Davies, Plaintiffs,**

**v.**

**Charles H. TRAYWICK, Defendants.**

**Civ. A. No. H–82–1058.**

United States District Court, D. Maryland.

July 7, 1983.

John R. Gerstein and Casey, Scott & Canfield, P.C., Washington, D.C. for plaintiff, Data Consultants, Inc.

Robert L. Pillote, Bethesda, Md., for plaintiff, Gary R. Davies.

Paul S. Richter and Batzell, Nunn & Bode, Washington, D.C., for defendant.

ALEXANDER HARVEY, II, District Judge.

This is an action for specific performance of a contract. The plaintiffs are Data Consultants, Inc. (hereinafter "DCI") and a former majority stockholder, Gary R. Davies (hereinafter "Davies"). The defendant is Charles H. Traywick (hereinafter "Traywick"), a minority stockholder and former officer of DCI.

Davies was one of the founders of DCI and had provided the initial capital to permit this closely held Maryland corporation to commence business operations in 1976. During the times pertinent to this suit, Davies was the majority stockholder of the corporation. Traywick had joined DCI shortly after it was organized and was a Vice President for some 3½ years between August of 1976 and February of 1980. As a part of his employment, Traywick had been issued 490 shares of common stock, a minority interest in the corporation, and he is still the owner of those shares. In late 1979 and early 1980, a dispute arose between Davies and Traywick concerning the latter's right to be issued more shares of stock in the corporation. Traywick was eventually fired by Davies on February 3, 1980. Thereafter, Davies sought to purchase the shares of stock owned by Traywick pursuant to an agreement between Davies and the other stockholders.

This suit seeks to require specific performance of this stock purchase agreement. It is plaintiffs' contention that Traywick and other minority stockholders agreed to sell their shares to Davies at a fixed price when certain events occurred, including termination of a stockholder's employment. Various defenses have been raised to this claim by defendant Traywick. In particular, Traywick asserts that there was an oral agreement between him and Davies whereby the latter had promised that all four of the primary individuals owning stock in the corporation would in time each own 25% of the outstanding stock. Claiming that Davies breached this oral agreement, Traywick contends that he is not obligated to sell his shares to the plaintiffs, even though he is no longer employed by DCI.

The suit has been brought by DCI and Davies because in 1982 Davies formally assigned to DCI his rights against Traywick, including his claimed right to purchase Traywick's stock at a fixed price. Diversity jurisdiction exists. The only issue before the Court is whether, under the agreement between Davies and Traywick, one of the plaintiffs is entitled to a decree of specific performance which would require the sale by defendant Traywick to that plaintiff of 490 shares of common stock in DCI at a price of $24,319.

Following discovery a Pretrial Order was entered by the Court. In the Pretrial Order the parties stipulated that at all times material, Davies and Traywick were bound by the terms of the written Stock Purchase Agreement executed by Davies and other stockholders and dated May 24, 1976.

The case then came on for trial before the Court sitting without a jury. Various witnesses testified and a number of exhibits were admitted in evidence. Much of the oral testimony was sharply conflicting. In resolving the issues of fact presented, due regard has been had to the credibility of the witnesses and the weight their testimony deserves. Findings of fact and conclusions of law pursuant to Rule 52(a), F.R. Civ.P., are contained in this written opinion.

I.

*Facts*

For many years, plaintiff Davies had been the Chief Executive Officer of Davies Associates, Incorporated, a corporation doing business in the computer industry. In the spring of 1976, Davies and John C.

Geddings, III, an employee at Davies Associates, decided to form a new corporation, the purpose of which would be to provide business computer systems for the beverage industry. On April 19, 1976, Articles of Incorporation of DCI were approved and received for record by the Maryland Department of Assessments and Taxation.

From the outset it was agreed that Davies would be the majority stockholder since he was the "money man" providing the necessary capital to permit this new corporation to operate. Davies was accordingly issued 510 shares of common stock and Geddings 490 shares. Davies was President and Treasurer; Geddings was Vice President and Secretary. Both stockholders also served as directors of the company. On May 24, 1976, Davies and Geddings executed a written Stock Purchase Agreement. The essential purpose of this Agreement was to insure that shares of stock in this closely held corporation should not pass to outsiders. Paragraph 1 of the Agreement was as follows:

1. *Restriction on shares.* None of the "shares" as defined below shall pass or be disposed of in any manner whatsoever to any person, partnership, or corporation without being offered in the manner herein provided to each of the Shareholders then holding shares and then living. . . .

Paragraph 4 contained the following language:

An offer shall be made not less than sixty (60) days prior to any proposed passage or disposition of shares whatsoever, including but not limited to passage or disposition by sale, delivery, assignment, gift, exchange, transfer distribution by an executor or administrator, or distribution by a trustee. . . .

Paragraph 5, in part, provided:

An offer shall remain open for thirty (30) days after the day on which notice of the offer is received by each of the Shareholders then holding shares. Notice of acceptance shall be sufficiently given if, before midnight of the 30th day, it is delivered in person to the offeror or mailed to the address of the offeror stated in the notice.

Pursuant to Paragraph 6, the purchase price was to "be computed as a function of the book value of each share shown on the balance of the company, as at the end of its last preceding tax year, prepared in accordance with normal accounting principles for this type of business by the firm of accountants then servicing the company." Paragraph 7 permitted the purchase price to be paid in cash or with 20% down and the balance in three annual installments evidenced by notes of the purchaser.

Also on May 24, 1976, Davies and Geddings executed a written Voting Trust and Management Agreement. That Agreement was to remain in force until the death of the survivor of the two shareholders or until such time more than one year from the execution of the agreement "when the company owes no monies to Gary R. Davies and Gary R. Davies is no longer guaranteeing any obligations of the company." Paragraph 3 of that Agreement provided as follows:

The Shareholders agree that the voting rights of all shares of stock issued or to be issued by Data Consultants, Inc., shall be vested in Gary R. Davies, who shall have the exclusive right to vote any or all such shares at all such times as shares of stock may be voted and further that all Directors elected by Gary R. Davies shall serve at his pleasure and shall be subject to removal at his lawful request.

At the outset, DCI operated out of the offices of Davies Associates. Its principal business was to sell computer hardware and write the software programs for the beverage industry. Several months after the corporation was formed, Geddings suggested that two of his friends should be hired as officers, namely defendant Traywick and Wayne S. Lehrman. Both of these individuals were employed by Data General Corporation and to persuade them to leave their employer it was agreed that they would be issued stock of DCI. However, Davies insisted that he remain majori-

ty stockholder of the corporation in view of the financial contribution he had made to the firm. All four agreed and an additional 1000 shares of common stock was issued to Davies, with Lehrman and Traywick each receiving 490 shares. In the summer or early fall of 1976, Lehrman and Traywick joined the company as officers (Vice Presidents) and directors.

It was further agreed that the transferability of the new shares of stock would be subject to the limitations of the Stock Purchase Agreement and to a further limitation if employment of one of the new stockholders was terminated. Accordingly, the following legend was placed on the stock certificates of the newcomers Lehrman and Traywick and also on Geddings' stock certificate:

> The transferability of this stock is limited by the provisions of the articles of incorporation of this corporation. Generally, stock may not be transferred for value without offer of sale first being made to the majority stockholder of the corporation at the book value. Upon termination of employment of a stockholder employed by the corporation, the majority stockholder shall have the right to purchase the stock at current book value. Gifts of stock may be made only with approval of the majority stockholder. Additional important requirements as to notice, time requirements, etc. are contained in the articles of incorporation.

Over the years Davies continued to provide financial backing for the corporation. He advanced money directly for operations, he guaranteed loans from other institutions, and on one occasion he pledged some $100,000 of securities so that a Washington bank would extend a line of credit to DCI for the purchase of an expensive computer.

Various conflicts developed over the years between Davies and Traywick. Traywick wanted to have an equal share of the stock ownership and insisted that Davies transfer shares so that the four officers would each own a 25% interest. Davies refused to enter into such an agreement,

particularly in view of his financial commitment in the corporation.

In December of 1979, Traywick indicated that he would be leaving DCI because he was not happy with Davies' management of the company. Davies in turn expressed dissatisfaction with Traywick's performance of his duties.

On January 18, 1980, John R. Willett, Esq., wrote Davies advising that he represented Traywick and inquiring whether Davies would purchase Traywick's equity in DCI. Willett indicated that Traywick intended to terminate his connection with DCI and he suggested that negotiations be concluded by March 1, 1980 so that Traywick might have "an opportunity to reestablish himself in the industry." Several weeks later, Traywick had been assigned to pick up representatives of an important client of DCI at the airport and later do a demonstration for them. Traywick chose this point in time to give Davies an ultimatum in an effort to coerce him into issuing additional stock to Traywick. Traywick told Davies that either the additional stock would be issued to him or he, Traywick, would not service the client in question as previously arranged. Justifiably angry, Davies fired Traywick, this having occurred on Sunday evening, February 3, 1980. Davies was forced to make last minute arrangements for Geddings to pick up representatives of the customer on Monday morning, February 4, 1980 and make the necessary presentation which had been assigned to Traywick.

By letter dated March 4, 1980, Davies wrote Traywick indicating that the Board of Directors of DCI had met in an effort to reach an equitable solution concerning Traywick's stock. On behalf of DCI, Davies offered to purchase Traywick's stock for $25,000, with a down-payment of $10,000 in cash and the balance to be paid over the next year. On March 12, 1980, Willett responded to this letter on behalf of Traywick indicating that he represented Traywick and that any communications should be directed to him. In this letter Willett said "Mr. Traywick rejects your offer of

March 4, 1980 and has requested this firm to prepare the necessary legal pleadings, and I will prepare those and will be filing the suit in the immediate future."

On March 21, 1980, Willett again wrote Davies. In this letter, Willett contended that at the time the corporation was formed an agreement was reached between the four stockholders that each would have 25% of the stock. He advised that Traywick had told him that Davies was to have additional shares of stock temporarily because of a loan he had made to the corporation, but that this loan had been repaid in August of 1979, at which time Davies was supposed to return his stock and arrange for each of the four directors to receive a 25% interest in the corporation. Willett "formally" called upon Davies to issue to Traywick additional shares of stock to reflect his 25% equity in the corporation, and he threatened that if the matter could not be resolved, Traywick would bring suit against the corporation and Davies as an individual. In his letter of March 21, 1980, Willett also presented the following offer to Davies: "He hereby offers to you, or any of the other stockholders of the corporation, his 25% interest in the corporation . . ."

Davies thereupon engaged Robert L. Pillote, Esq. to represent him in connection with his dispute with Traywick. By letter dated May 2, 1980, Pillote wrote Willett stating: "Mr. Gary R. Davies has asked me to respond on his behalf to a portion of your letter of March 21, 1980. Mr. Traywick's offer to sell his 490 shares of stock of Data Consultants, Inc. is accepted . . . but for the sum that Mr. Traywick committed himself to when he acquired the shares, which is book value as of the last annual accounting date, June 30, 1979." Pillote purportedly sent Willett a copy of the Stock Purchase Agreement calling his attention to Paragraphs 6 and 7. He also enclosed a copy of a letter from the corporation's accountant indicating that the book value of Traywick's stock as of June 30, 1979 was $24,318.70. Pillote indicated that Davies would buy Traywick's shares for that amount with 20% down at closing and the balance payable in three equal annual installments evidenced by notes becoming due one year from the date of closing and annually thereafter, with interest at the date of closing at 5% per year. Pillote noted that Lehrman had already sold his shares of stock for the same price and was no longer a stockholder and that Geddings was not interested in purchasing Traywick's shares. Pillote requested that closing be held within 30 days.

On May 19, 1980, Willett responded to Pillote. In that letter he denied that Traywick was bound by the Stock Purchase Agreement, asserting that the agreement of May 24, 1976 was binding only on Davies and Geddings and was not applicable to Traywick. Willett further stated that his client was not willing to accept the value which DCI's accountant had put on the stock, and was in the process of securing experts "to testify in the court case or to present evidence as to the true value." He further stated "it appears he will be required to file the suit and ask for an accounting and he will request a court order to have the books of the corporation examined by experts of his choosing and to have the corporate records made available in order that his expert witnesses in a competitive field can put the true value of the corporation before the court." He suggested that Pillote make a more realistic offer and that if he did not "we must look forward to crossing swords."

Pillote had inadvertently neglected to send Willett a copy of the Stock Purchase Agreement of May 24, 1976. By letter to Willett dated May 23, 1980, Pillote enclosed a copy of the Agreement. He contended that Traywick was bound by the agreement between the parties, particularly in view of the legend written on his stock certificate. Pillote repeated his position that Traywick was bound to sell his stock to Davies at the book value determined by the corporation's accountants. Pillote further stated that Davies was contemplating a suit for specific performance of the agreement "if Mr. Traywick does not comply with the Agreement, although the alternative is to let Mr.

Traywick remain a stockholder. * * * Should Mr. Traywick choose litigation, Mr. Davies and the Company are determined to defend or pursue the matter as long as it takes to win."

Willett responded on May 27, 1980 as follows:

Reference is made to your letter of May 23, 1980. You do not have a Stock Purchase Agreement which Mr. Traywick signed and you cannot obligate him because he is not privy to what was signed by Gary R. Davies and John C. Geddings. As rapidly as we can, we will file a suit and let the court decide who will prevail.

On August 14, 1980, Traywick himself wrote to Davies, calling upon him to institute a suit on behalf of DCI for "an accounting derivative stockholder suit, etc. to protect the corporate assets. This suit should be brought for the use and benefit of the corporation. If you do not institute such an action in the Circuit Court of the County of Montgomery within ten (10) days, the undersigned will institute this action for the corporation's use and benefit and for the benefit of the stockholders."

By Agreement dated June 26, 1981, Davies sold to the corporation and to a group of employee purchasers all of the shares of stock which he then owned. Six hundred shares were sold to Gerald Bonnes, Robert H. Caspers, William P. Scheff and Russell E. Shaner, who were then employees of the corporation. Seven hundred seventy shares were sold to the corporation to be converted into treasury shares. On April 26, 1982, Davies formally assigned to DCI his rights and causes of action against Traywick for specific performance arising out of Traywick's agreement to sell his shares of DCI and his refusal to so sell the shares following the termination of his employment. The next day, April 27, 1982, this action was commenced in this Court by DCI and Davies. On July 27, 1982, Traywick filed an equity action in the Circuit Court for Montgomery County, and on August 5, 1982, he filed an action at law in that same court, *Traywick v. Davies, et al.,* Equity No. 80660 and *Traywick v. Davies,*

*et al.,* Law No. 61580. These suits were brought against DCI, Davies and others, and both actions are still pending.

## II.

### *Discussion*

The sole issue in this case is whether the plaintiffs or one of them is entitled to specific performance of an agreement with defendant Traywick. No counterclaim was asserted in this case and various other disputes between the parties are the subject of pending litigation in the Circuit Court for Montgomery County. Specific performance of a contract is a matter of sound judicial discretion controlled by established principles of equity. *Offutt v. Offutt,* 106 Md. 236, 67 A. 138 (1907). In determining whether to grant or withhold relief of this sort, the Court should consider all of the circumstances of the particular case in the light of equitable principles. *Id.* at 241, 67 A. 138. Initially of course the plaintiff must prove the existence of an agreement between the parties and a breach of that agreement by the defendant. *Id.*

The evidence here discloses that the agreement between Davies and Traywick with reference to the disposition of Traywick's minority shares in DCI was partly written and partly oral. Although initially disputing this fact, Traywick now concedes that he is bound by the provisions of the Stock Purchase Agreement. Thus, in May of 1980 and thereafter, Traywick was not entitled to sell his stock without first offering it to each of the other living shareholders then holding shares. The agreement was quite specific as to the controlling purchase price, which would be the book value of the stock at the end of the preceding tax year, prepared by the company's accountant. The evidence establishes that the corporation's fiscal year ended on June 30 of each year and that in the spring of 1980 the valuation of the stock would be as of June 30, 1979. Moreover, Paragraph 7 of the Stock Purchase Agreement specified terms of payment and permitted the purchaser to

pay cash or not less than 20% in cash with the balance to be paid in not more than three equal annual installments.

■ When in July of 1976 Traywick became a minority stockholder of DCI, his ownership of stock was clearly subject to this restriction. Moreover, Davies insisted on another provision to be added to the original agreement when Traywick joined the company. This provision had to do with termination of employment of a minority shareholder. Obviously, it would be somewhat awkward if Geddings or Lehrman or Traywick were no longer employed by the corporation, but still owned a minority interest in its stock. Thus, Davies insisted that there be a further restriction requiring each of the minority shareholders to sell stock to Davies, the majority shareholder, upon termination of his employment. This added term was accomplished by means of adding the legend set forth hereinabove to each of the stock certificates issued to Lehrman, Geddings and Traywick. Traywick signed the stock certificate directly under this legend and is therefore bound by its terms.

Defendant argues that this provision of the agreement is too indefinite to be enforced in this action for specific performance. However, the evidence discloses that the legend on the stock certificate must be read together with the provisions of the Stock Purchase Agreement. This Court finds that there was one overall agreement between Davies and Traywick. Some of the provisions are contained in the Stock Purchase Agreement, while others are set forth in the legend placed on Traywick's stock certificate. The evidence discloses that there are several typographical errors in the legend. Quite clearly the intention of the parties was that the words "the articles of incorporation" were intended to mean "the Stock Purchase Agreement." When so read, the terms of the Stock Purchase Agreement were applicable to restrictions on disposition of a minority stockholder's interest in the corporation at the time of his termination. Accordingly, Davies had the right to purchase Traywick's

stock upon termination of his employment at its book value as of the end of the preceding fiscal year. Moreover, under the Stock Purchase Agreement, Traywick could not dispose of his stock to any other person or company without offering it to each of the then living shareholders holding shares.

The reasons for the existence of these restrictions on the disposition of stock by minority shareholders is apparent from the evidence. Davies was the majority stockholder, and he wished to retain control because of his large financial interest in the corporation. This was a small, closely held company, and Davies had provided the financial resources from the outset and had continued to be personally responsible for corporate indebtedness. In the Stock Purchase Agreement itself, it was recognized "that the success of the Company requires the active interest and support and the personal attention of its shareholders and that for this reason it is not advisable to permit its shares to go upon the open market for sale, ..." It was further stated in the preamble to the Stock Purchase Agreement that the stockholders desired "to guard against the introduction into the ownership of the company of strangers not willing and able to contribute in like member to the success of the company, by restricting the privilege of owning the shares in the company." However, the original Stock Purchase Agreement had not included any requirement that a minority shareholder must sell his shares back to the corporation when his employment was terminated for any reason at all. Thus, the additional provision was added in July of 1976. Traywick was bound by this provision as well as by all of the other provisions of the agreement between him and Davies restricting the sale or disposition of the shares of stock in the corporation that he controlled.

■ It is not disputed that Traywick's employment was terminated on February 3, 1980. Indeed, it is not claimed in this case (as Traywick has asserted in other litigation between the parties) that he was

wrongfully terminated. The evidence presented here discloses in any event that Davies was fully justified in firing Traywick on Sunday night, February 3, 1980. By presenting Davies with an eleventh hour ultimatum, Traywick improperly attempted to coerce Davies into making a new agreement with him concerning his ownership of stock of the company. Traywick's precipitous actions at this time were clearly inimicable to the sound operation of the company's business, and Davies had every right to fire him.

 Upon the termination of Traywick's employment, Davies had the right to require that Traywick sell his minority shares to Davies as the majority stockholder. The letter of May 2, 1980 from Pillote to Willett was a proper demand on behalf of Davies that Traywick sell his 490 shares of stock to Davies at the book value of the stock as of June 30, 1979. This demand was rejected by Traywick. Such rejection amounted to a breach of the agreement between the parties. Under all the circumstances here, this Court finds and concludes that plaintiff DCI is entitled to specific performance of this contract between Davies and Traywick.

## III.

### Defenses

As his principal defense, defendant Traywick relies on an alleged oral agreement between him and Davies whereby each of the four stockholders was to own 25% of the outstanding stock. Defendant contends that under this agreement, Davies was to have additional shares amounting to a controlling interest only temporarily and until the initial loan made by him to the corporation had been repaid. Defendant claims that this loan was repaid around August of 1979 and that at that time Davies was obligated to return his stock so that a 25% interest could be issued to each of the four directors. According to defendant Traywick, under this agreement, Davies was not the majority stockholder after August, 1979, and therefore defendant Traywick was not required to sell his stock

to Davies or to anyone else when his employment was terminated.

On the record here, this Court finds and concludes that no such oral agreement was ever reached between Davies and Traywick. The Court will give full credit to the testimony of Davies who was a most credible witness. Davies testified that he never entered into an oral agreement with Traywick whereby each of the four stockholders would own 25%. There was some general discussion that at some time in the future, Davies would consider such an arrangement. However, there was no meeting of the minds reached at any time before Traywick's employment was terminated on February 3, 1980. Moreover, the evidence clearly establishes that Davies' loan to DCI was not repaid until September or October of 1980. Therefore, even if this Court were to find that an oral agreement of the type claimed by defendant Traywick did exist, there was no obligation on the part of Davies to give each of the other stockholders 25% of the stock before Traywick was fired and he became obligated to sell his stock to the majority stockholder. It should be noted that both Lehrman and Geddings left the employ of DCI in 1981, and both then sold their stock to the corporation and received approximately the amount offered to Traywick for his stock.

The testimony of defendant Traywick, who was successfully impeached by counsel for the plaintiffs, will not be credited. Traywick was constantly shifting his position as it suited him at various times during his dispute with plaintiff Davies. Shortly before and after he was fired, Traywick claimed that Davies had mismanaged the company. However, in an earlier letter to Davies, Traywick stated that there was no way that the company could have survived without the leadership of Davies. During his deposition, Traywick testified that he was not bound by the Stock Purchase Agreement. Subsequently, when it became apparent that this position could not be sustained, Traywick stipulated that the provisions of the Stock Purchase Agreement were binding on him.

Nor did the testimony of Lehrman and Geddings convince the Court that any oral agreement like the one relied upon by defendant was ever reached by the parties. Lehrman vaguely remembered a conversation indicating that Davies would retain control until he was paid all of the money which he had advanced to the corporation. He testified, however, that there were so many meetings between the parties that it was hard to tell what happened. He was uncertain as to the details, remembering only an ongoing dispute about the stock but no specifics. Geddings showed an obvious bias against Davies and DCI, and there was hostility between these parties because Davies had accused Geddings of stealing trade secrets of DCI when he left and formed a competing company. Indeed in December 1981, he sued DCI and Davies in this Court. *See Geddings v. Data Consultants, Inc.*, Civil No. M–81–3217. An agreement was reached in May of 1983 to dismiss this suit with prejudice because it was of doubtful merit.

Unlike the oral agreement relied upon by defendant Traywick, the agreement which this Court has found to have existed between the parties is set forth both in documents and in credible testimony presented by the plaintiffs. The documents support and corroborate the testimony of Davies at the trial. Davies recognized at an early date that if Traywick, Geddings and Lehrman owned three-quarters of the stock of the corporation, he, Davies, would be out on the street at a time when he still was owed money by the company. The clear intention on his part, and on the part of defendant Traywick when he signed the stock certificate containing the restrictive legend, was that a stockholder whose employment was terminated would have to sell his stock to Davies at the price set forth in the Stock Purchase Agreement.

Besides the Stock Purchase Agreement and the typed legend on the stock certificates themselves, the Voting Trust and Management Agreement is further documentary evidence of Davies' intention to maintain control of the corporation as long as it owed him money. Traywick, of course, was not a party to this Agreement. Nevertheless, that written document corroborates Davies' testimony concerning his intention to restrict the sale or transfer of the stock by the minority shareholders.

■ As his next argument, defendant contends that Davies did not timely exercise his right to require Traywick to sell his stock, and that accordingly specific performance should not be ordered. He first claims that under Paragraph 5 of the Stock Purchase Agreement, Davies was required to purchase the stock within 30 days of the date of the termination of Traywick's employment. The provisions of Paragraph 5 simply do not support any such argument. The language in question clearly refers to an offer to be made to other stockholders by a shareholder who seeks to dispose of his stock. The language in question does not apply to a stockholder like Traywick whose employment was terminated. As to such a stockholder, the agreement between Davies and Traywick did not include any specific time for performance. Accordingly, it was merely necessary that the majority stockholder (namely Davies) exercise his contractual right within a reasonable time. Here, the right was exercised within a period of some 90 days, which, under all the circumstances, was entirely reasonable. The May 2, 1980 letter of Pillote had been preceded by several letters between the parties and their attorneys, including numerous threats of litigation to be commenced by Traywick against Davies. There was therefore good reason for Davies to delay in formally exercising his contractual right. Accordingly, equitable relief should not be denied because Davies did not act with reasonable promptness to assert his contractual right to have Traywick sell his stock.

Defendant Traywick advances a host of other contentions which he asserts defeat plaintiffs' entitlement to a decree of specific performance in this case. None of these contentions has merit, and they do not require extensive discussion.

Pointing to the language of the legend typed on the stock certificate issued to him, defendant argues that he was entitled to receive "current value" for his stock, and that since plaintiffs have not offered proof of any such value, he is not required to sell his stock for $24,319. But as indicated, the legend on the stock certificate must be read together with the Stock Purchase Agreement. When so read, the term "current value" clearly was intended to mean current book value at the close of the preceding fiscal year. Plaintiffs properly proved that this figure was $24,319. In any event, it was apparent that Traywick did not believe at the time that he was obligated under any agreement with Davies and that he was not at the time rejecting Davies' offer because of any dispute as to the value of the stock or the proposed manner of payment.

It is also contended that Pillote's letter of May 2, 1980 did not conform to the agreement between the parties because Davies' offer should have been in cash. Again defendant ignores the language of the Stock Purchase Agreement which formed a part of the overall agreement between the parties. Under Paragraph 7 of that Agreement, the purchaser of Traywick's stock had the right to offer 20% in cash and the balance in three equal annual installments evidenced by notes of the purchaser becoming due one year from the day on which the sale was closed and annually thereafter, with interest from the date of closing at 5% per year. This was the precise offer contained in Pillote's letter of May 2, 1980.

It is also asserted that the agreement between the parties was too ambiguous to be enforced by this Court. However, as the Court has found, the agreement between Davies and Traywick consisted of provisions of the Stock Purchase Agreement and of the legend on the stock certificate, as well as conversations between the parties and their conduct during the time in question. Any ambiguity concerning the intention of the parties was fully explained by the testimony and exhibits in the case.

Defendant argues that his stock certificate was not a "security" within the meaning of Maryland statutory law and that therefore the common law statute of frauds followed in Maryland would be applicable and would defeat plaintiffs' right to a recovery. This Court is satisfied that the Traywick stock certificate is in fact a "security" within the meaning of the Uniform Commercial Code as adopted in Maryland. For the reasons stated in Judge Jones' Memorandum and Order in this case of December 30, 1982, the statute of frauds does not bar plaintiffs' right to a recovery.

Defendant also contends that the doctrine of laches is applicable here and would defeat plaintiffs' right to the equitable relief sought. However, the delay between defendant's breach of the agreement between the parties and the filing of suit in this Court was clearly explained by the evidence presented. Defendant Traywick had repeatedly threatened suit against Davies and DCI. This threat was repeated on so many different occasions that Davies had every right to expect that suit would in fact be filed against him. Under such circumstances, it was entirely reasonable for Davies to wait for the other side to sue him so that the dispute between the parties might be resolved in a single litigation. When it became apparent that Traywick's statements were no more than empty threats, Davies and DCI finally instituted this action in this Court. Moreover, there has been no showing of prejudice on the part of defendant Traywick which would permit him to invoke the doctrine of laches in order to defeat a recovery in this case. The witnesses and documents which defendant has relied upon and which were available several years ago were still available at the time of the trial.

Claiming that there were irregularities in the holding of stockholders' and directors' meetings and in the signing of the minutes of those meetings, defendant asserts that equitable relief should be denied because plaintiffs came to this Court with unclean hands. However, the evidence discloses no irregularities of any consequence. The meetings in question were in fact held, and the actions described in

**458**

the minutes were in fact taken. That corporate minutes were prepared and signed at a later date is hardly grounds for denying equitable relief in this case.

Finally, defendant has questioned the validity of the assignment of Davies' right of action to DCI. This Court finds and concludes that the assignment of April 26, 1982 was a valid one. Since defendant questioned the validity of the assignment, this suit was properly brought with both the assignor and the assignee named as plaintiffs. *See United States v. Barrett*, 315 F.Supp. 941, 946 (N.D.W.Va. 1970). In view of valid assignment, the right to specific performance is now owned by DCI, and it is therefore the corporate plaintiff which is entitled to the relief sought.

### IV.

*Conclusion*

For the reasons stated, plaintiff DCI is entitled to a decree of specific performance which will require defendant Traywick to sell 490 shares of the common stock of DCI to said plaintiff at a price of $24,319. The claim of plaintiff Davies will be dismissed without prejudice as moot.

Counsel should confer and present to the Court within fifteen (15) days an appropriate Order.