**UNITED STATES of America, Appellee,**

v.

**John E. MURRAY, Jr.,
Defendant-Appellant.**

**No. 79-1477.**

United States Court of Appeals,
First Circuit.

Argued March 11, 1980.

Decided May 15, 1980.

Steven J. Brooks, Boston, Mass., with whom John C. Foskett and Glass & Brooks,

Boston, Mass., were on brief for defendant-appellant.

Kevin J. O'Dea, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge:

Defendant John Murray, Jr. was convicted, after a jury trial, upon one count charging him with conspiracy in violation of 18 U.S.C. § 371 and upon twenty-one counts charging him with having willfully and knowingly introduced into the United States imported glue by means of false statements in violation of 18 U.S.C. § 542. The district judge imposed a sentence of 2 years—6 months to be served, the balance to be suspended—and a fine of $20,000.

On his appeal to this court defendant states that the issues are (1) whether the sub-term "substantial transformation" used in 19 C.F.R. § 134.1(b) is "unconstitutionally vague," (2) whether the district judge in his instructions to the jury adequately defined that sub-term, (3) whether the district judge erroneously refused to permit cross-examination of a government witness as to his motives, and (4) whether the district judge erroneously denied defendant's motion for acquittal.

The gist [1] of the allegations of count 1 is that, in violation of 18 U.S.C. § 371, defend-

---

* Of the District of Massachusetts, sitting by designation.

1. Count 1 of the indictment after identifying Nicholson and Co., Inc., the defendant John Murray, Jr., the defendant Stephen Hopkins, the defendant Bas Trommelen, and John Murray, Sr. makes in paragraphs 6, 7, and 8 the following allegations:

"6. From on or about February, 1972, and continuously thereafter through on or about January, 1975, the exact dates being to the Grand Jury unknown, at Boston and Cambridge, in the Commonwealth and District of Massachusetts and elsewhere outside said District, the defendants,

STEPHEN HOPKINS
JOHN MURRAY, JR.
BAS TROMMELEN

with each other and another person or persons to the Grand Jury both known and unknown did knowingly, willfully and unlawfully combine, conspire, confederate and agree together, and with each other, 1) to defraud the United States Customs Service of and concerning its governmental functions and rights, by obstructing and defeating the Customs Service of the United States in its lawful governmental function of efficiently administering the Customs laws of the United States, more particularly the administration of imported merchandise into the United States, free from dishonesty and deceit in violation of Title 18, United States Code, Section 371; 2) to knowingly and intentionally enter and introduce and cause to have entered and introduced into the commerce of the United States merchandise by means of fraudulent and false documents and statements, made and cause to be made false statements in declarations without reasona-

ble cause to believe the truth of such statements and procure and cause to be procured the making of false statements to material matter, to wit, the proper dutiable value and country of origin of said merchandise without reasonable cause to believe the truth of such statements in order to avoid paying the lawful duties and taxes thereon; in violation of Title 18, United States Code, Section 542; and 3) to knowingly and willfully conceal and destroy and cause to have concealed and destroyed invoices and papers relating to said imported merchandise for the purpose of suppressing evidence of fraud against the United States Customs Service in violation of Title 18, United States Code, Section 551.

7. It was part of the conspiracy that the defendants, in matters within the jurisdiction of the United States Customs Service, and its agents, to wit, the assessment of tax and duties due on imported merchandise entered and introduced into the commerce of the United States, would make and cause to be made false statements in declarations, invoices and documents to the United States Customs Service and its agents and conceal from the said Customs Service and its agents the true facts concerning the country of origin of imported glue, its value and commissions paid thereon in order to prevent the true assessment of tax and duties due thereon.

8. It was further a part of the conspiracy that the defendants would knowingly and intentionally destroy and conceal from the United States Customs Service invoices and papers relating to glue imported into the United States in order to perpetuate their scheme to defraud the United States Customs Service and its agents of properly assessing the taxes and duties on said glue."

Following paragraph 8, count 1 recites thirty overt acts.

ant Murray and others conspired (1) to defraud the United States Customs Service by obstructing it in its lawful function of efficiently administering the customs laws, in violation of 18 U.S.C. § 371, (2) to knowingly and intentionally cause to be entered into the commerce of the United States merchandise by means of false statements, in violation of 18 U.S.C. § 542, and (3) to knowingly and willfully conceal and destroy papers relating to said merchandise for the purpose of suppressing evidence of fraud against the United States Customs Service, in violation of 18 U.S.C. § 551. The count also alleges that in furtherance of this single conspiracy Murray and the other conspirators caused the commission of thirty overt acts.

Counts 2 through 22 [2] each charged that on a specified day defendant Murray and others did willfully enter glue into the commerce of the United States by means of false statements and by false and fraudulent invoices and declarations. Inasmuch as, except for dates and numbers, counts 2 through 22 were identical, it will suffice if we quote count 2 in the margin. [3]

■ The evidence, viewed as it should be when the issue is whether the evidence is sufficient to support a conviction, (see *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *United States v. Zozlio*, 617 F.2d 314, at 315 (1st Cir. 1980); and *United States v. Indelicato*, 611 F.2d 376, at 384 (1st Cir. 1979)) in the light most favorable to the government, was to the following effect.

Nicholson and Company (hereinafter "Nicholson") of Cambridge, Massachusetts is an importer of animal glue. During 1972–1975 defendant John Murray, Jr. was its vice president and chief executive officer; John Murray, Sr., an elderly, ill man, was its president; and Stephen Hopkins was a vice president who was in charge of daily operations when defendant was absent.

N. V. Lijmfabriek C. Trommelen (hereinafter "Trommelen") of Dongen, Holland was a dealer and manufacturer of glue. Trommelen's chief operating officer was Bas Trommelen.

Defendant in May, 1972 agreed with his father, Hopkins, and Bas Trommelen upon a plan for Nicholson to purchase Chinese glue abroad from English and German brokers, to have that glue shipped to Trommelen at Rotterdam, and to have Trommelen take that glue to its Dutch factory to rebag the glue, and to re-export it as though it were made in Holland and as though it were sold by Trommelen to Nicholson.

---

2. The grand jury returned an indictment in 38 counts. Before the trial began the district judge, upon the government's motion, dismissed 16 counts. He seems to have directed that there should be prepared and given to the petit jury a new paper, a so-called indictment, showing the 22 remaining counts with each of them, except count 1, having a new number but otherwise unchanged. For example, count 3 was re-numbered 2. No doubt, the district judge's procedure simplified presentation of the case and kept from the jury knowledge of dismissed counts which might have prejudiced Murray and other defendants. Inasmuch as no one objected to this procedure, we shall assume that the district judge exercised a permissible discretion and we shall refer to the counts by their new numbers.

3. Count 2 alleges:
   "1. The Grand Jury hereby realleges and incorporates by reference as if set forth in full herein Paragraphs 1 through 5 of Count I.
   2. On or about November 14, 1973, the exact date being to the Grand Jury unknown, at Boston and Cambridge, in the district and Commonwealth of Massachusetts and elsewhere outside said District, the defendants, STEPHEN HOPKINS JOHN MURRAY, JR. BAS TROMMELEN and another person or persons to the Grand Jury both known and unknown, acting in concert and in furtherance of and as part of the conspiracy and plan charged in Count I of this indictment, did willfully and knowingly enter and introduce in the commerce of the United States imported merchandise, that is, glue, by means of false statements and by means of false and fraudulent invoices, declarations, affidavits, and certain other paper, to wit, Special Customs Invoice and Customs Consumption Entry No. 118169, which said documents were false and fraudulent in that they did not reflect the proper dutiable entered value and country of origin of said merchandise.
   In violation of Title 18 United States Code Section 542 and 2.''

In carrying out the scheme, Nicholson prepared in Cambridge purchase orders for Chinese glue and sent them to English and German glue brokers outside the United States. Those foreign brokers bought the glue in China and shipped it to Rotterdam. From there Trommelen trucked the glue to its factory in Dongen, Holland where Trommelen rebagged the glue. After the glue arrived in Rotterdam, Nicholson purported to sell the glue to Trommelen for prices lower than Nicholson paid its English and German brokers. After Trommelen had rebagged the glue, Trommelen purported to re-sell it to Nicholson for the same price Trommelen had originally paid Nicholson, plus charges for (1) the trucking in Holland, (2) the rebagging at Trommelen's factory, and (3) Trommelen's loss of interest on the money it paid Nicholson which Nicholson later repaid Trommelen.

Nicholson paid to Bas Trommelen individually for his part in the transactions a special commission on each shipment of glue.

When Trommelen's shipment of glue to Nicholson reached the United States Nicholson, through its custom broker, presented to the United States Customs Service the documents showing the purchases of glue from Trommelen, and filled in and delivered to the Service its Form 5515, "Special Customs Invoice" and its Form 7501–B, "Consumption Entry,"[4] so as to show that (1) Holland was "the Country of Origin" of the merchandise and (2) the "Entered Value in United States Dollars" was an amount based upon the price which Nicholson paid Trommelen on the resale of the glue by Trommelen to Nicholson, but not taking into account the special commission which Nicholson paid Trommelen individually for his part in the preceding transaction.

With an intent to defraud the Customs Service, Nicholson concealed from the Service all documents or other information with respect to its purchases in China through its English and German brokers of the very glue which it was importing.

Defendant Murray personally directed or participated in all of the above acts of Nicholson, its custom brokers, and its other agents.

When defendant Murray became concerned that the Customs Service was on the trail of the fraudulent scheme with respect to the glue he sent to Bas Trommelen this message:

"Whatever needs to be done to defend yourself against whatever charges Customs may make, we advise you to do, even if it means preparing a set of duplicate books or whatever."

Responding to defendant Murray's statement of the issues he seeks to raise on this appeal, we first consider whether, as applied to the facts in this case, the definition of "Country of Origin" set forth in 19 C.F.R. § 134.1(b) was vague.

So far as relevant, 19 C.F.R. § 134 provided:

§ 134.0  *Scope.*

This part sets forth regulations implementing the country of origin marking requirements and exceptions of section 304 of the Tariff Act of 1930, as amended (19 U.S.C. 1304), together with certain marking provisions of the Tariff Schedules of the United States (19 U.S.C. 1202). It also contains provisions regarding false or misleading markings as to the country of origin. The consequences and procedures to be followed when articles are not legally marked are also set forth. Special marking and labeling requirements are covered elsewhere.

§ 134.1  *Definitions.*

When used in this part, the following terms shall have the meaning indicated:

(b) *Country of origin.* "Country of origin" means the country of manufacture, production, or growth of any article of foreign origin entering the United States. *Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of*

4. No one transmitted those custom forms to the court of appeals, and they are not quoted in the briefs or the appendix. We, however, have examined in the district court those exhibits.

*origin"* within the meaning of this part. [Emphasis added]

We perceive nothing vague in the sub-term "substantial transformation" as used in the 19 C.F.R. § 134.1(b) definition [5] of the basic term "country of origin," and as applied to the facts in this case. Our analysis of that basic term and the sub-term follow.[6]

The term "country of origin" and the sub-term "substantial transformation" appear in a regulation which has the declared purpose of "implementing . . . the Tariff Act of 1930 as amended (19 U.S.C. [§] 1304) and the Tariff Schedules of the United States (19 U.S.C. [§] 1202)." That act and those schedules impose a duty on each imported article at a rate determined according to the article's "country of origin." Were there no definition of that basic term it would be clear enough; the term would have its ordinary meaning; it would mean the country where the first manufacture, production, or growth of an imported article occurred; it would leave aside as totally irrelevant any subsequent country where the article had been processed or from which it had been exported to the United States. One purpose of the definition set forth in 19 C.F.R. 134.1(b) is, as the opening sentence of that sub-section reveals, to retain that ordinary meaning of

"country of origin" as being in the generality of cases the appropriate key to the applicable rate set forth in the tariff schedules.

Another purpose of the definition is, as the closing sentence of that sub-section reveals, to cover the exceptional cases where "work or material [has been] added to an [imported] article in another country." The closing sentence of the subsection is necessarily premised on the proposition that in the case of some, but not all, imports originating in one country and processed in a second country, it would be appropriate to make applicable the rate of the second country. Without expressly so stating, the regulation has the obvious purpose of making applicable the second country's rate when and only when the contribution of the second country to the value of the imported article was of great significance compared to the contribution of the first country. We can discern no other possible rational purpose for the otherwise totally unnecessary sub-section.

The sub-section of the regulation proceeds suitably to implement that last purpose by the use of the sub-term "substantial transformation" in the closing sentence of 19 C.F.R. § 134.1(b).

"Substantial transformation," while not a term or sub-term in common use, is com-

---

5. It must not be overlooked that the sub-term is part of a definition of the basic term "country of origin." There is a point beyond which it is not practical to continue the process of sub-definition. Certainly the sub-definition need not be reduced to the few words which Professor I. A. Richards thought were "Basic English."

In the case of a customs, tax, penal, or otherwise coercive statute or regulation a definition needs to be only sufficiently clear adequately to inform the person subjected to a command what obligation is imposed upon him by the statute or regulation.

In the case of a judge's instructions to the jury, it is unnecessary for the judge to define a sub-term in an administrative regulation's definition of a statutory basic term unless the sub-term is so opaque or obscure that its meaning would not be clear to a juror of common education and common sense. The mere fact that a term in a statute or regulation is sufficiently clear so that the person to whom it is addressed can understand it and be punished for violating that law does not automatically prove that the term is also clear to a juror; although

the converse is true. That is, any term which is clear to the average juror would not be held to be too vague to serve as the basis of a punishment.

Our analysis in the main body of the opinion of the sub-term "substantial transformation" is directed at demonstrating that the sub-term would be clear to an importer, like the defendant, under statutory commands to give to the United States Customs Service information about an imported article and to make payment of a customs duty imposed on such an article.

It will appear later in the opinion that we need not decide whether the sub-term "substantial transformation" without further definition by a judge, would be clear to a jury.

6. Being mindful that the interpretation of terms in a regulation or statute should take into account their context, we address ourselves first to the relevant statutes and regulations and then to the etymology of the two words in the term "substantial transformation."

posed of two words in common use. "Transformation," whether or not modified by an adjective, means a *fundamental* change, not a mere alteration, in the form, appearance, nature, or character of an article. As is indicated by its first syllable, it means a change which carries an article or other object *across* from one class to another class. When used to aid in the determination of the appropriate rate of duty under a tariff schedule it means such a change as to move the article either from one to another of the classes established by official tariff schedules, or from one to another of the classes of goods, wares, and merchandise commonly recognized in the commercial markets where such articles are traded. As a modifier of "transformation," "substantial" means more than "fundamental" because if that were its only meaning it would be redundant; it means a very great change in the article's "real worth, value." See Random House Dictionary (1967), p. 1418, "substantial," 6th meaning. Hence as part of a sub-term in a definition of a basic term used as a key to rates in tariff schedules, "substantial" has an *economic* meaning. The adjective "substantial" informs us that the degree of change is to be measured with reference to economic value, and the degree must be very great.

When read, as it should be, as a unified expression, not as two separate words, and when read in the light of the purpose of the closing clause of sub-section (b) of 19 C.F.R. § 134.1, we hold that the sub-term "substantial transformation" means a fundamental change in the form, appearance, nature, or character of an article which adds to the value of the article an amount or percentage which is significant in comparison with the value which the article had when exported from the country in which it was first manufactured, produced, or grown.

That meaning of the sub-term "substantial transformation" not merely is in accord with the purpose of the closing sentence of 19 C.F.R. § 134.1(b), and in accord with common usage of each of the two words which together compose the sub-term, but also is the one which would naturally occur to a person of common education and common sense who realized, as he should from reading the whole of 19 C.F.R. § 134.1(b), that the general rule was to treat the country where an article was produced as the "country of origin" in determining the applicable tariff rate, and that the use of the rate of another country where the article was later processed could be proper only in the exceptional case where it was fairer to both the United States and the importer to take the rate of the second country. Proof of this last proposition lies in an hypothetical case. Suppose that at a time, like the present, when the tariff rate favors Holland over China, an article was produced in Holland and later processed in China in ways which did not substantially add to its value. No importer of the article from China and no customs official would be likely to read 19 C.F.R. § 134.1(b) as making the Chinese rate applicable to that hypothetical case.

Some of the rulings by the Customs Service to which the defendant's brief calls our attention may not be consistent with our interpretation of the sub-term "substantial information."

We feel no obligation to defer or give much weight to those administrative rulings which are not supported by reasoning, which are "unprincipled," and which Judge Learned Hand would have analogized to decisions by a Kadi at the gate. This is not a situation in which the agency entrusted by Congress with the task of applying a statute has adopted a view which not only reflects a greater familiarity than ours with the intricacies of the statute, but also embodies a principle or rationale which is applicable beyond the particular case in hand. Cf., *e. g., Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *Edwards' Lessee v. Darby,* 25 U.S. (12 Wheat.) 206, 210, 6 L.Ed. 603 (1827); *Chapman v. Commissioner of Internal Revenue,* 618 F.2d 856, at 868 (1st Cir. 1980); 2 K. Davis, Administrative Law Treatise § 7:14 (2d ed. 1979).

Nor is there any evidence that the defendant or those with whom he was associated relied upon any rulings of the Customs Service when they made statements or acted with respect to the glue here involved.

■ We now examine the evidence in this case, viewed most favorably to defendant. Here we examine the evidence from defendant's view because what we are about to decide is whether there was enough evidence for the judge to submit to the jury for its decision the question whether the change in the glue effectuated in Holland was sufficient to constitute a "substantial transformation." Cf. *Capp Homes v. Duarte*, 617 F.2d 900, at 902 (1st Cir. 1980). We are not now considering whether the defendant's conviction should be sustained because the jury was justified in rejecting the defendant's view of the evidence and instead accepting the government's view of the evidence—to wit, that nothing more than rebagging of the glue occurred in Holland.

■ On the view of the evidence favorable to defendant, Trommelen blended the Chinese glue with other glues to achieve uniform and proper bloomgram strength and other properties, screened the glue to remove the gross impurities, ground the glue to achieve a uniform and higher quality mesh size, and added a defoamer to obtain proper foam content—the effect of all this processing being to transform the glue from processors' goods to end-users' goods.

We conclude that even if we accept defendant's view of the evidence, that evidence was as *a matter of law* insufficient to show[7] that there had been in Holland a "substantial transformation" of the glue.

Our reasons for that conclusion are that there was no evidence that while it was in Holland the glue had increased in value by any particular percentage or amount, except by the cost of the rebagging; and that the uncontradicted evidence showed that after the glue had been in its factory Trommelen resold the glue for the same price it paid for it, plus the costs of rebagging, cartage, and interest.

The upshot of the matter is that "examined in the light of the facts of the case at hand,"[8] (1) there was no vagueness[9] in the 19 C.F.R. § 134.1(b) definition of "country of origin," (2) there was not sufficient evidence that the glue had undergone a "substantial transformation" in Holland for the trial judge to have submitted to the jury the question whether it was the country of origin; and (3) the district judge should have instructed the jury as a matter of law that if it found that the glue had been originally manufactured in China, a statement that Holland was the country of origin was false.

It follows that the defendant's first point (with respect to vagueness) has no merit; and his second point (with respect to allegedly inadequate instructions as to the

---

7. When the issue is whether defendant made a false statement, the government, because it has the burden of proving falsity, has also the burden of proving what would be a true statement of the glue's country of origin. The government has borne the burden of going forward when it has shown that the glue was manufactured in China. When defendant claims that his glue falls within the exception because in Holland it underwent "substantial transformation," he has the burden of proving such "substantial transformation" because in effect he is alleging that the glue comes within an exception.

8. The phrase "the facts of the case at hand" comes from the statement in *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975), repeated in *United*

*States v. Powell*, 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975), that "It is well established that vagueness challenges to statutes [or regulations] which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand."

Where, as here, the questions are whether as a matter of law a regulation was vague and whether the trial judge correctly instructed the jury, "the facts of the case at hand" means the evidence viewed most favorably to the defendant.

9. We need not and do not consider whether the standard of vagueness is different when the question is whether a person claims that the exception to a rule is vague from the standard of vagueness when the question is whether the main thrust of the rule is vague.

meaning of the subterm "substantial transformation") is moot.

■ We next consider whether the district judge did, as defendant contends, "commit error in preventing defendant from cross-examining the key [g]overnment witness . . . as to his financial motives to testify falsely that he did not substantially transform the glue in Holland." Even if the district judge erred in not permitting the cross-examination, defendant has not been prejudiced. The critical question was whether there had been in Holland a substantial change in the economic value (as distinguished from the physical characteristics) of the glue. It made no difference whether the government witness testified falsely as to the physical (as distinguished from the economic) changes made in the glue, or as to his opinion as to whether those physical changes had constituted a substantial transformation in the physical characteristics or market classification of the glue. The defendant did not claim in the trial court or here that he wished to cross-examine the witness on the vital question as to what economic value was added to the glue by Dutch processing. If he had so claimed, the claim would have been unsound because (except for the cost of rebagging—which was not disputed) this topic had not been covered by the direct examination.

■ We need not consider whether the district judge erred in denying defendant's motions for a judgment of acquittal on the charge that he falsely stated the dutiable value of the imported glue. In each of its twenty-two counts the indictment charges that the statute there involved had been violated by several acts or means alleged conjunctively: that is, both by false statements as to dutiable value and by false statements as to the country of origin.

Since the jury returned a general verdict of guilty on each of the 22 counts, and there was sufficient evidence with respect to the false statements as to the glue's "country of origin," we need not consider whether there was sufficient evidence with respect to the alleged false statements as to the glue's value,[10] or as to other false statements.

*Affirmed.*

---

10. The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged. *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *United States v. Richman*, 600 F.2d 286, 298 (1st Cir. 1979); *United States*

*v. Outpost Development Co.*, 552 F.2d 868 (9th Cir. 1977), *cert. den.* 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450 (1977); *United States v. Hathaway*, 534 F.2d 386, 398, n. 11 (1st Cir. 1976); *United States v. Barbuto*, 471 F.2d 918, 922, n. 3 (1st Cir. 1973); *United States v. Lee*, 422 F.2d 1049, 1052 (5th Cir. 1970).