**UNIROYAL, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Court No. 82–3–00404.**

United States Court of
International Trade.

June 10, 1982.

Barnes, Richardson & Colburn, New York City (Andrew P. Vance and Richard Haroian, New York City, at the trial and on the brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Attorney in Charge, Commercial Litigation Branch, New York City (Barbara M. Epstein, New York City, at the trial and on the brief), for defendant.

MALETZ, Judge.

Footwear uppers consisting of complete shoes except for an outsole are manufactured by plaintiff in Indonesia and imported by it into the United States. After importation, plaintiff sells the uppers to the Stride-Rite Co., which completes the manufacturing process by attaching pre-shaped outsoles to the uppers and then markets the finished shoes to retail establishments.

This case involves 82 pairs of footwear uppers of the type specified above which plaintiff manufactured in Indonesia from leather and other materials of United States origin. Plaintiff sought to import these uppers and sell them to Stride-Rite so that it could attach the outsoles and market

the completed shoes in accordance with its normal practice. However, on January 26, 1982, the uppers were excluded from entry when the Customs Service refused to permit them to be withdrawn from the warehouse for consumption on the ground that they were not marked with the country of origin as required by section 304 of the Tariff Act of 1930, as amended (19 U.S.C. 1304). Given these considerations, the question is whether Stride-Rite is the ultimate purchaser of the imported uppers so as to exempt them from the country of origin marking requirements. This in turn depends on whether the manufacturing process in which Stride-Rite attaches the outsoles to the imported uppers effects a "substantial transformation" of the uppers.

### The Statute and Regulations

Section 304(a)(3)(H) of the Tariff Act of 1930, as amended (19 U.S.C. 1304(a)(3)(H)), provides:

(a) Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

\* \* \* \* \* \*

(3) Authorize the exception of any article from the requirements of marking if—

\* \* \* \* \* \*

(H) An ultimate purchaser, by reason of the character of such article or by reason of the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked to indicate its origin;

Section 134.1(d) of the Customs Regulations (19 C.F.R. 134.1(d)) provides in pertinent part:

(d) *Ultimate Purchaser.* The "ultimate purchaser" is generally the last person in the United States who will receive the article in the form in which it was imported. It is not feasible to state who will be the "ultimate purchaser" in every circumstance. The following examples may be helpful:

(1) If an imported article will be used in manufacture, the manufacturer may be the "ultimate purchaser" if he subjects the imported article to a process which results in a substantial transformation of the article, even though the process may not result in a new or different article.

(2) If the manufacturing process is merely a minor one which leaves the identity of the imported article intact, the consumer or user of the article, who obtains the article after the processing, will be regarded as the "ultimate purchaser."

Section 134.35 of the Customs Regulations (19 C.F.R. 134.35) provides:

*Articles substantially changed by manufacture.*

An article used in the United States in manufacture which results in an article having a name, character, or use differing from that of the imported article, will be within the principle of the decision in the case of *United States v. Gibson-Thomsen Co., Inc.,* 27 CCPA 267 (C.A.D. 98). Under this principle, the manufacturer or processor in the United States who converts or combines the imported article into the different article will be considered the "ultimate purchaser" of the imported article within the contemplation of section 304(a), Tariff Act of 1930, as amended (19 U.S.C. 1304(a)), and the article shall be excepted from marking. The outermost containers of the imported articles shall be marked in accord with this part.

### The Facts

As indicated previously, except for the absence of an outsole, the upper in its condition as imported is a complete shoe. Thus in its condition as imported, the upper has been substantially transformed in Indonesia

from sheets of leather into a substantially complete shoe. And having been "lasted" in Indonesia the upper has already attained its ultimate shape, form and size.[1] In appearance, the upper resembles a moccasin [2] save that it has a stitched seam, and roughing on the bottom to facilitate the attachment of the outsole. Because of these latter characteristics, the upper is not marketable at retail as a complete shoe.

Prior to exportation to the United States, the uppers are packed in cartons which are marked "Made in Indonesia." However, the uppers themselves are not marked with the country of origin.

Subsequent to importation into the United States, plaintiff sells the uppers to Stride-Rite in the cartons marked "Made in Indonesia." Stride-Rite then attaches pre-shaped and pre-sized outsoles to the uppers, cleans and polishes the uppers, and thereafter sells the completed shoes to retail stores under the trade name "Sperry Topsiders."

In the process of attaching the outsole to the upper, Stride-Rite relasts the leather upper, applies cement to the bottom of the upper to provide a temporary bond for the outsole, temporarily bonds the outsole to the upper by an outsole press, removes the last, and then attaches the outsole to the upper by stitching on a "Littleway" machine.

The purpose of relasting—which consists of reinserting a last into the previously completed and lasted upper—is not to give the upper shape, form or size. Rather, it is to hold the upper steady and so facilitate the alignment and temporary cementing of the outsole to the upper. Relasting, though convenient, is not necessary to the attachment of the outsole to the upper inasmuch as hand pressure alone is sufficient to press the upper and outsole together to provide a temporary bond.

The process of combining the uppers to the outsoles is significantly less time consuming than the process of manufacturing the upper. Thus the record shows that it takes more than eight times the amount of time to manufacture the upper than to attach the outsole to the upper. In this connection, a time study shows that it takes some four hours to manufacture twelve pairs of uppers similar to the imported merchandise whereas only one-half hour is required to attach twelve pairs of uppers to the outsoles.

The process of combining the uppers to the outsoles is also significantly less costly than the process of manufacturing the upper, with the record indicating that the cost of direct labor in the manufacture of the upper is about eight times greater than the cost of the direct labor required to attach the outsole to the upper. Also, the cost to Stride-Rite for the imported upper is significantly greater than the cost of the outsole.

In addition, manufacture of the upper requires at least five highly skilled operations including cutting the leather, skiving,[3] stitching the collar, setting up the hand lasting and hand sewing the upper. In contrast, the only highly skilled operation necessary in combining the upper and outsole is the Littleway stitching.[4]

1. The purpose of lasting is to permanently alter the shape of the leather so that it will fit a human foot. The lasting operation here involves the molding of wet, flat leather pieces around a last, which is a plastic, metal or wood form in the shape and size of a foot; tacking the leather pieces in place on the last; stretching and pulling the leather around the last with pincers; and then with the leather on the last, hand-sewing the leather pieces together. When the leather dries, its shape has been transformed from flat leather pieces to the shape of the upper in its permanent fixed form.

2. A moccasin is a single piece of leather which cradles the bottom of the foot and extends upward to form the back and sides and extreme front of the toe portion. The forepart of the foot is covered by a second piece of leather called a "plug" which is hand sewn to the combination sole and upper.

3. The purpose of skiving is to reduce the thickness of edges of leather upper parts which are to be folded over or otherwise joined to another part.

4. It is to be noted that Sperry Topsider outsoles are sold by Stride-Rite to shoe repair shops and that one repairman in such a shop can perform the same combining operations as Stride-Rite.

*Opinion*

Section 304 of the Tariff Act of 1930, as amended, requires that with certain specified exceptions, every article of foreign origin imported into the United States be marked with its country of origin in such a manner that its ultimate purchaser in the United States will be aware of the country of origin. The legislative purpose of this enactment, as explained by Chief Judge Re, was "to enable the *'ultimate purchaser'* of the goods to decide for himself whether he would 'buy or refuse to buy them'." *Globemaster, Inc. v. United States*, 68 Cust.Ct. 77, 80, C.D. 4340, 340 F.Supp. 974, 976 (1972). [Emphasis added.] See also *The Tariff Law—No Option to Import Without Marking*, 12 Colum. Journal of Transnational Law 596 (1973).

Given the statute and its legislative purpose, plaintiff contends that the uppers are not required to be marked—this on the asserted basis that Stride-Rite is the ultimate purchaser of the uppers within the meaning of section 304(a)(3)(H) of the Tariff Act of 1930, as amended (19 U.S.C. 1304(a)(3)(H)). Stride-Rite, plaintiff argues, is the ultimate purchaser because it allegedly effects a substantial transformation of the uppers into new articles having a different name, character and use, i.e., shoes.

Under the Customs Regulation quoted previously (19 C.F.R. 134.1(d)), the "ultimate purchaser" is described generally as "the last person in the United States who will receive the article in the form in which it was imported." That regulation further provides that "[i]t is not feasible to state who will be the 'ultimate purchaser' in every circumstance" but that certain specified examples "may be helpful." Two such examples listed in the regulation are applicable here. The first (19 C.F.R. 134.1(d)(1)) states that "[i]f an imported article will be used in manufacture, the manufacturer may be the ultimate purchaser *if he subjects the imported article to a process which results in a substantial transformation of the article*, even though the process may not result in a new or different article."

[Emphasis added.] The second ·example listed (19 C.F.R. 134.1(d)(2)) provides, however, that if the manufacturing process is *"merely a minor one which leaves the identity of the imported article intact"* the consumer is regarded as the ultimate purchaser. [Emphasis added.] See Note, *Country of Origin Marking*, 6 Law and Policy in International Business 485, 511 et seq. (1974).

■ With this background, the test to be applied is whether the imported article has undergone a "substantial transformation" which results in an article having a name, character or use differing from that of the imported article. If such substantial transformation occurs, then the manufacturer is the ultimate purchaser and the consumer need not be informed of the country of origin. On the other hand, if the manufacturing or combining process is merely a minor one which leaves the identity of the imported article intact, a substantial transformation has not occurred and an appropriate marking must appear on the imported article so that the consumer can know the country of origin.

■ To determine whether a substantial transformation of an article has occurred for purpose of ascertaining who is the "ultimate purchaser," each case must be decided on its own particular facts. *Grafton Spools, Ltd. v. United States*, 45 Cust.Ct. 16, 23, C.D. 2190 (1960). See also, e.g., *United States v. Murray*, 621 F.2d 1163 (1st Cir. 1980); *Texas Instruments, Inc. v. United States*, —— CCPA ——, 681 F.2d 778 (1982).

■ Examining the facts in the present case, the conclusion is clear that a substantial transformation of the upper has *not* occurred since the attachment of the outsole to the upper is a minor manufacturing or combining process which leaves the identity of the upper intact. Thus the upper— which in its condition as imported is already a substantially complete shoe—is readily recognizable as a distinct item apart from the outsole to which it is attached. And the manufacturing process performed by

Stride-Rite is a minor assembly operation which requires only a small fraction of the time and cost involved in producing the uppers.

The fact is that the manufacturing operation performed by Stride-Rite in attaching the outsole to the upper is conceptually no different than (for example) attaching buttons to a man's dress shirt or attaching handles to a finished piece of luggage. To consider attachments of this kind to be a "substantial transformation" would be to open the door wide to frustration of the entire purpose of the marking statute. Thus in the present case it would be misleading to allow the public to believe that a shoe is made in the United States when the entire upper—which is the very essence of the completed shoe—is made in Indonesia and the only step in the manufacturing process performed in the United States is the attachment of an outsole.[5]

Notwithstanding these considerations, plaintiff insists that the following cases support its position that Stride-Rite's attachment of the outsole effects a "substantial transformation" of the imported uppers so as to exempt them from the country of origin marking requirements: *United States v. Gibson-Thomsen Co., Inc.*, 27 CCPA 267, C.A.D. 98 (1940); *United States v. International Paint Co., Inc.*, 35 CCPA 87, C.A.D. 376 (1948); *Midwood Industries, Inc. v. United States*, 64 Cust.Ct. 499, C.D. 4026, 315 F.Supp. 951 (1970), *appeal dismissed*, 57 CCPA 141 (1970); *Grafton Spools, Ltd. v. United States*, 45 Cust.Ct. 16, 23, C.D. 2190 (1960). But each of these cases is clearly distinguishable.

In *Gibson-Thomsen* wooden toothbrush handles and brush blocks were imported for use in the manufacture of tooth and hair brushes. In the manufacture of the brushes, holes were bored into the handles and blocks; bristles were inserted and imbedded; the bristles were trimmed; and the handles polished and stamped. The cost of the bristles and the labor costs involved in inserting the bristles in the United States were significantly higher than the cost of the imported handles. Given these factors, the court held that since the imported articles were to be used in the United States as a material in the manufacture of new articles having a new name, character and use and which lost their identity when combined with other articles, the imported articles were substantially transformed in the United States so that country of origin marking of the new articles was not required.

In the present case, however, the imported upper has not lost its identity and is scarcely a mere material in the manufacture of a finished shoe. On the contrary, as previously indicated, the imported upper is the very essence of the finished shoe. Moreover, in contrast to the *Gibson-Thomsen* merchandise, where the bristles added in the United States constituted the greatest portion of the cost of the completed article, Stride-Rite's cost for the outsole which is added to the imported upper is significantly less than its cost for the upper.

In *International Paint*, the second case relied on by plaintiff, the issue was whether the collector had properly disallowed a claim under section 313(a) of the Tariff Act of 1930 (19 U.S.C. § 1313(a)) for drawback upon the exportation of "Antifouling Semi Paste Paint."[6] In that case, paint in paste form was imported from England. The paint contained the essential ingredients necessary in anti-fouling paints, but also contained certain impurities in the form of

---

5. It is to be noted that the processes that are performed by Stride-Rite can be and often are also performed by a shoe repairman in a shoe repair shop. In that circumstance should the attachment of an outsole to the imported upper be deemed a "substantial transformation" of the upper, it would follow that an American shoe repairman who attaches the upper to the outsole would necessarily have to be regarded as the manufacturer of the completed shoe.

6. Section 313(a) provided that "[u]pon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 percentum of such duties, * * *."

mineral acids and metal salts which rendered the imported product unfit for use as an anti-fouling paint. After importation, the paint was subjected to a series of processes which removed the impurities, reduced its viscosity and made it commercially usable as an anti-fouling paint. The collector denied the claim for drawback on the ground that the product was neither "manufactured nor produced" in the United States with the use of imported merchandise. The Court of Customs and Patent Appeals affirmed the determination of this court sustaining the protest of the collector's decision (18 Cust.Ct. 105, C.D. 1052 (1947)) and held that the exported product had in fact been manufactured in the United States from the imported paint on the ground that both the character and use of the paint had been changed. In the present case, however, the upper itself underwent no physical change whatever. Nor was its intended use changed. It was manufactured by plaintiff in Indonesia to be attached to an outsole; it was imported and sold to Stride-Rite for that purpose; and Stride-Rite did no more than complete the contemplated process.

Plaintiff's reliance on *Midwood Industries* is likewise misplaced. In that case, rough steel forgings were imported into the United States and then subjected to several machining processes by the importer-manufacturer to convert them into finished flanges and fittings. The machining processes included boring, facing, spot facing, drilling, tapering, threading, bevelling, and heating and compressing. The court held that such processes resulted in a substantial transformation of the forgings so that the domestic manufacturer was determined to be the ultimate purchaser and country of origin marking of the individual flanges was therefore not necessary. In the present case, by contrast, the complex manufacturing processes occurred in Indonesia where the imported uppers were produced. However, in the United States only a minor assembly process takes place, namely, attaching the outsole to the upper.

*Grafton Spools*, the last case relied on by plaintiff, is also distinguishable. There empty typewriter ribbon spools were imported into the United States and sold to manufacturers of ribbons and business machines which wound the ribbons on the spools. The court held that the manufacturers were the ultimate purchasers for two reasons: First, the court found that the process of winding ribbons on empty spools was not merely a process of filling a spool, but rather one that required technical skill and competence in order to insure that the ribbon would be evenly distributed, properly inked and have the properties of tension and ability to reverse, which are necessary to the proper operation of a business machine. Secondly, as pointed out by the court: "What the ribbon manufacturers sell are ribbons. True, the ribbon is wound on a spool. But it is the ribbon, so wound, and not the spool as such, which the business machine manufacturers buy from the ribbon manufacturers." 45 Cust.Ct. at 24.

Here, however, unlike the process involved in *Grafton Spools*, only a simple process of attaching outsoles to uppers occurs. Moreover, in *Grafton Spools* the ribbon and not the spool was the essence of the finished article, while here the upper is the essence of the completed shoe. Thus unlike the empty spools, the uppers are not simply a vehicle for the sale of something else (i.e., soles), rather they remain as the major feature of consumer interest.

In summary, the court holds that plaintiff is not the ultimate purchaser of the imported uppers since the operations performed in the United States do not constitute a substantial transformation thereof. Therefore, the Customs Service determination requiring marking of the uppers is affirmed and the action is dismissed.