M.B.I. MERCHANDISE INDUSTRIES, INC., PLAINTIFF *v.*
UNITED STATES, DEFENDANT

Court No. 87–03–00472

(Decided June 26, 1992)

*Ross & Hardies* (*Joseph S. Kaplan* and *Michelle F. Forte*), for plaintiff.
*Stuart M. Gerson*, Assistant Attorney General, *Joseph I. Liebman*, Attorney-In-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Bruce N. Stratvert* and *Al J. Daniel*) for defendant.

## OPINION

### INTRODUCTION

MUSGRAVE, *Judge:* This case turns on whether photo albums imported from Taiwan and the People's Republic of China ("PRC") were actually the produce of Korea. Plaintiff M.B.I. Merchandise Industries ("MBI") protested the seizure of eleven shipments of photo albums. The Customs Service denied the protest on the grounds that the seized albums were actually produced in Korea and transhipped through Taiwan, in an attempt to avoid antidumping duties. MBI brought suit in this Court to protest the exclusion of the albums. A trial was held on the issue of country of origin of the photo albums. After trial, further briefs were filed at the request of the Court.[1]

The subsidiary, but threshold question central to the various government threats and proceedings, is whether the plaintiff and its principals have made false statements about the origin of the merchandise in question. Having considered the appearance, composure and accuracy of plaintiff's testimony, the Court finds plaintiff's witnesses credible, and the government's case to be based upon unsubstantiated suspicion.

Because the original ruling which held that the albums were Korean was flawed, because the government's own test to determine the country of manufacture of photo album pages was flawed, and because the government's witnesses could not differentiate between Taiwanese and Korean photo album pages at trial, the Court finds that the Customs Service overcame its own presumption of correctness, and that the albums were improperly excluded.

### FACTS

MBI manufactures and distributes photo albums, some of which it imports from Taiwan and the PRC. The albums at issue consist of a

---

[1] Citations to the separate transcripts of the bifurcated trial will be "Tr. A" for the first transcript and "Tr. B" for the second transcript.

three-ring or a coil binder attached to a decorated or padded cover, containing "magnetic" pages which have clear plastic sheets attached to them by a dry glue. Labels are placed on the albums, which are then shrink-wrapped.

Prior to 1985, MBI imported a majority of its photo albums from Korea. Tr. B at 45–46. In October, 1985, antidumping duties of 64.81% were imposed against Korean photo albums and magnetic pages. Once the duties were imposed, Korean albums were priced out of the market. MBI officials visited Taiwan and began importing photo albums from a Taiwanese supplier, Three Leaf Stationery Products ("Three Leaf"). Tr. B at 96. MBI started purchasing from Perfect Leatherware Company in the PRC at around the same time. Tr. B at 45, 98–99.

The evidence at trial showed that Three Leaf had the production capacity to make enough photo album covers to fill MBI's orders throughout the seizure period. Tr. B at 453. The government's expert witness admitted that Three Leaf had adequate cover-making capacity. Tr. B at 429. After MBI placed its orders in late 1985, Three Leaf increased the quality of its magnetic pages and purchased another automatic page-making machine in April, 1986. See Pltf. Exh. 7. Three Leaf was thereafter able to produce a large number of photo album pages and completed photo albums by running the machines around the clock. Tr. A at 136–138. MBI admits that Three Leaf imported some pages from Korea, and that MBI suggested that Three Leaf import some Korean pages if it could not meet MBI's requirements with its own production. Tr. A at 56–62. Three Leaf was reluctant to do so because the Korean pages cost more than its own production. Tr. A at 198.

MBI imported eight shipments from Three Leaf[2] and three from Perfect Leatherware[3], a PRC manufacturer. MBI claims that only seven percent of the pages it imported from Three Leaf were made in Korea, based on Three Leaf's production records. The government attempted to show that a larger share of the seized albums contained Korean pages; however, the government failed to present evidence to support this supposition.

In early 1986, the Customs Service received reports that a large number of Korean photo albums were being transshipped before importation to the U.S. in an attempt to avoid antidumping penalties. Without otherwise attempting to verify the accuracy of that information or the country of origin of MBI's imports the Customs Service refused to admit eleven MBI photo album shipments in late 1986. The Customs Service later seized the eleven shipments. The seizures were based on a physical test of the photo album pages, preliminary information supplied by a competitor company and a "Korea" marking stamped on the three-ring binder of some of the albums. Tr. B at 147. Customs also relied on the "drastic" shift in the declared country of origin of photo albums to

---

[2] Entry Nos. 86–709687–5, 86–709688–8, K–23–4000001–1, K–23–4000003–7, K–23–4000008–6, K–23–4000026–8, K–23–4000028–4, and K–23–4000050–8. Plaintiff's Post-Trial Brief, at Schedule A.

[3] Entry Nos. K–23–4000006–0, K–23–4000007–8, and K–23–4000060–7. Plaintiff's Post-Trial Brief, at Schedule A.

producers which did not, according to "the best knowledge" of Customs' import specialists, have the production capacity to make photo albums. Tr. B at 150. No Customs agent visited any of the newly exporting factories to verify production before the seizures, although a Customs agent did visit the Three Leaf plant in 1987, more than a year after the actions against MBI were undertaken to verify that Three Leaf was producing photo albums. Tr. B at 150, Jt. Exh. 22.

After the albums were seized, Customs Special Agent Ronald Kellmer asked the Customs Office of Regulations and Rulings ("ORR") to determine whether the seized albums should be excluded. Tr. B at 197. Special Agent Kellmer reported to the ORR that the imported albums were entirely Korean-made and were only assembled and packaged in Taiwan. Tr. B at 163. Special Agent Kellmer testified that officers of MBI had told him that they had ordered and were using parts from Korea. Tr. B at 176. He later elaborated that either Mr. Bash or Mr. Leykin of MBI had stated to him that complete sets of components had been shipped from Korea and then simply assembled and "blister packed" in Taiwan. Tr. B at 203.

Special Agent Kellmer indicated that the basis for his statement was, at least in part, contained in Joint Exhibit 15, a set of handwritten notes of a meeting of Customs officials with Mr. Leykin, president of MBI, and counsel for MBI. Tr. B at 206. No other documentary evidence at trial supported Special Agent Kellmer's testimony. The specific paragraph in Joint Exhibit 15 that Special Agent Kellmer referred to as supporting his assertion states, "*In some cases*: Korean leafs, rings, and flats are imported into Taiwan, assembled and then exported to U.S. as [a] Product of Taiwan." Jt. Exh. 15 at 3 (emphasis in original).

Mr. Leykin testified to his recollection of the meeting described in Joint Exhibit 15. He stated that he had explained that MBI had no knowledge of any transshipments. The Customs officials had wanted to know if he knew about any other manufacturers in Taiwan that made albums for export to the United States. Tr. B at 452. When asked by examining counsel about the paragraph referred to in Special Agent Kellmer's testimony, Mr. Leykin testified that "he asked me if I knew any assembly operations and I told him I heard of some whereby they were importing flats from Korea and assembled them in Taiwan." Tr. B at 453. He then stated that MBI's Taiwanese supplier, Three Leaf, had more than enough capacity to produce flats (i.e. album covers), and that he had never heard of Three Leaf importing flats from anywhere. Tr. B. at 453.

The excerpt relied on by the government, when read in context, supports Mr. Leykin's recollection of the meeting more credibly than Special Agent Kellmer's. Special Agent Kellmer had earlier testified that he never knew that Three Leaf could produce album covers. Tr. B at 235. The evidence showed that only a fraction of all the imported pages were produced in Korea, and only one shipment of three-ring binders was imported by Three Leaf from Korea. Tr. A at 158.

The ORR ruled that photo album pages "determine the nature and use of the article, and are its essence," because the binders and covers could be used for other purposes. Pltf. Exh. 22, at 2. Based on that conclusion and the flawed *assumption* that the albums were almost entirely Korean-made, the Customs Service concluded that the albums were improperly marked with Taiwan or the PRC as their country of origin. *Id.* Customs excluded the seized containers.

MBI officials met with Customs to discuss the seizures. Testimony indicates that the Customs agents entered the small meeting room with their service revolvers clearly visible on their hips. Special Agent Kellmer told MBI that the "transshipment" constituted a conspiracy to avoid antidumping laws[4] and if they did not plead guilty to a count of attempting to enter merchandise by means of a false statement, the Customs Service "would seize every container and put [MBI] out of business." Tr. B at 455–456. MBI's president testified that he knew he would be bankrupted if Customs carried out its threat. Tr. B at 244–45, Pltf. Exh. 33. MBI agreed to produce all the documents requested by Customs, and to cooperate in the investigation. Customs then arranged for charges to be brought against MBI for entering merchandise by means of the false statement that the "magnetic photo albums were manufactured and imported from Taiwan when in fact such magnetic photo albums contained components of Korean origin." Def. Ex. 23. MBI waived the indictment and pleaded guilty in U.S. District Court to one count of entering merchandise by means of a false statement.[5] Def. Exhs. 20–24.

MBI protested the seizures and brought suit in this Court after the protest was denied.

### DISCUSSION

Under 19 U.S.C. § 1304, goods must be conspicuously marked with their country of origin. 19 U.S.C. § 1304(a) (1992). Additional duties are levied if imported items are incorrectly marked, 19 U.S.C. § 1304(f), and delivery of the goods can be withheld until they are properly marked, 19 U.S.C. § 1304(g) (1992). Criminal penalties for intentional concealing of proper country of origin marking are provided in 19 U.S.C. § 1304(h) (1992). Civil penalties may be assessed under 19 U.S.C. § 1592 (1992) for entering merchandise by means of a false statement.

Defendant, the United States, frames the question before the Court as "[w]hether plaintiff has rebutted the presumptively correct finding by Customs that the merchandise in issue was not properly marked with country of origin." Def. Brief, at 13. The Court finds that *the government* as well as plaintiff have rebutted the presumption of correctness.

---

[4] Although the government claims that the change of supply sources constitutes a conspiracy to avoid U.S. antidumping duties, it seems to be a thoroughly rational business decision. Companies like MBI scrambled to find alternative suppliers, and Three Leaf, among others, took advantage of the opportunity presented. As noted by the Customs Agent who verified Three Leaf's photo album production,

[i]t appears that the industry felt months in advance that Korea was in trouble with the U.S. and began entering the market or arranging production (as with Leykin) well before the December 16, 1985 imposition of dumping duties against Korea.

Jt. Exh. 15, at 4.

[5] That plea did not specify any of the containers which are the subject of this litigation.

A. *Presumption of Correctness:*

Customs' determinations of the admissibility of merchandise are presumptively valid. *United States v. H.M. Young Assoc., Inc.*, 62 CCPA 20, C.A.D. 1138, 505 F.2d 721 (1974); 28 U.S.C. § 2639(a)(1) (1992). To overcome that presumption, plaintiff must demonstrate that Customs' determination was erroneous. *Jarvis Clark Co. v. United States*, 2 Fed. Cir. (T) 70, 75, 733 F.2d 873, 878 (1984). The conclusion may be erroneous when any subsidiary fact presumed to be correct is disproved. *United States v. New York Merchandise Co.*, 58 CCPA 53, C.A.D. 1004, 435 F.2d 1315, 1318 (1970).

Based on the information supplied to the ORR by Special Agent Kellmer and ORR's determination that photo album pages are the essence of a photo album, Customs ruled that the albums were the product of Korea. However, plaintiff proved that the information Special Agent Kellmer gave to the ORR was incorrect. The fundamental facts underlying the ORR's ruling were erroneous. Plaintiff also showed that the physical test of magnetic pages could not accurately reveal the country of origin of any magnetic page; the government's suspicion that MBI was transshipping Korean albums or pages was never corroborated.

B. *The Jerk Test:*

Customs used two methods to determine the country of origin of the albums. First, the albums were visually checked for country of origin markings, both on the containers and on the parts that make up the albums. Next, the Customs agents used the "jerk" test: to test for the different method for attaching the plastic cover to the magnetic page used in Korean pages, an agent jerked down on the plastic sheet covering the page. If the sheet came off easily, then according to the test, it was from Korea. If not, then the page was assumed to have come from Taiwan:

> [T]here is a slight difference in the way the pages adheres [sic] to the edge. The * * * cellophane on the * * * the Korean page, actually when you peel it over it has a slight resistance but [on] the very edge where the paint is there is almost no adhesion and it pops right off and its just painted * * * on. On the Taiwanese [page] * * * that we knew was from Taiwan, um, the page actually when you got over to where the cellophane hit the gold [bead] there was adhesion, like there was a glue right on the edge. And this was based on the evidence that was sent to me by our agents overseas and by my comparing of the albums that I had. They were unopened at the time I received them saying Korean and Taiwanese from MBI and there was a slight variation.

Tr. B at 146.

The Customs Special Agents thus "determined" that the MBI albums pages were made in Korea. The jerk test is based not on any scientific method, but on tips provided to the Customs Service by a domestic manufacturer and on a report based on samples obtained by Customs agents. Tr. B at 275–76. Customs agents used as controls sample pages

from albums marked made in Korea, but were unable to prove that the control pages themselves were actually produced in Korea. Tr. B at 318, 324. Customs never determined whether all Korean pages were made on the same type of machine. Tr. B at 309–310. Nor did the government show that the Taiwanese control pages were actually made in Taiwan. The only affirmative evidence that the samples were made in Taiwan was a Customs Headquarters Report based on information provided confidentially by a competitor of MBI. Jt. Exh. 11.

Customs Special Agent Kresock stated flatly that he was unable to distinguish pages' countries of origin. Tr. B at 383–385. The government's expert witness, Sheldon Holson, former president of a domestic photo album company, testified that no one could tell what a page's country of origin was unless they knew what machinery was used where. Since machinery and techniques are constantly being upgraded, Mr. Holson testified, it is virtually impossible to determine what country made what pages. Tr. B at 443. Mr. Holson then mistakenly identified the country of origin of a sample page. Tr. B at 447. Plaintiff's witnesses corroborated Mr. Holson's testimony that it was impossible to determine the country of origin of any page by visual inspection alone. Tr. B at 23. Mr. Lee, manager of Three Leaf, testified that Korean and Taiwanese pages differed in the relative quality of the duplex board, the color of the gold colored powder used to accent the outer edge of the page, the regularity and width of the lines of "magnetic" glue on the page. Tr. A at 149.

The crucial — and fatal — flaw in the jerk test is that it cannot distinguish two pages made on similar machines located in different countries. It has the same result on pages made on the same type machine, whether it is located in Korea or Taiwan or Singapore. There was even evidence that some machines can be converted to make both "Korean-style" and "Taiwanese-style" pages.

Although Customs was able to prove that different types of pages were imported in both the control samples they used and in the MBI containers, they failed to show that any one page was typical of all pages produced in a certain country. As the government's expert testified, magnetic page characteristics are constantly changing. Based on the testimony of its own witness Customs was unfounded in its belief that the jerk test could conclusively determine whether the pages in the containers imported by MBI were of Korean origin.

C. *The Customs' Ruling That the Albums Were Products of Korea was Incorrect:*

The seizures were based in part on the Customs Service ruling that photo album pages "determine the nature and use of the article, and are its essence," because the binders and covers could be used for other purposes. Pltf. Exh. 22, at 2. This deduction was contradicted by the evidence. Magnetic pages alone are unsalable as photo albums. Therefore, the pages alone cannot determine the nature and use of photo albums.

The identity of a photo album comes from the combination of its components. Each of the components alone is only marginally salable or

unsalable compared to a completed album. The cover of the album is what differentiates one style photo album from another, and is what "sells" the album. The essence of photo albums are the album covers along with the pages as each is necessary for its use.

### D. *Plaintiff Overcame the Presumption That the Pages Were Made in Korea:*

If plaintiff presents a *prima facie* case, the presumption of correctness is overcome and the government has the burden of going forward with the evidence. *United States v. Edson Keith & Co.*, 5 Cust. Ct. Appls. 82, T.D. 34128 (1914). Plaintiff has proven that the large majority (over 90%) of the Three Leaf pages were made in Taiwan. The government failed to prove that any pages were made in Korea, apart from plaintiff's admission that seven percent of the MBI pages were Korean. The government attempted to show that a majority of the MBI pages were made in Korea and that Three Leaf lacked the capacity to produce the quantities of album covers and pages needed to fill MBI's orders. Mr. Holson, for example, testified that he doubted that Three Leaf could run its plant around the clock, and that his calculations showed Three Leaf could only have produced one third the number of pages it shipped to MBI. Tr. B at 48. His calculations were based largely on assumptions and estimates of album sizes and costs, and were therefore conjectural.[6]

The manager of the Three Leaf plant, Mr. Ming-Hung ("Oscar") Lee, testified that Three Leaf had shipped a number of albums with Korean pages, but that well over half the cost of exported albums was due to labor and materials from Taiwan. Tr. A at 67, 103. Mr. Lee's testimony was credible and to the point. It was corroborated by other evidence produced by MBI. Although Special Agent Kresock did not believe Mr. Lee[7], Mr. Lee's testimony in court was believable. His testimony was directly supported by a videotape showing Three Leaf's manufacturing facilities and automated page-making machines. The government did not controvert the authenticity of the videotape. Mr. Lee's testimony was corroborated by the visual testimony of the videotape as well as other witnesses. The government's most damaging witness' testimony, Special Agent Kellmer, was not similarly supported.[8]

---

[6] Mr. Holson's testimony is self-serving because it was his company which filed the original antidumping petition against the Korean producers. The witness therefore has at least a partial interest in the outcome of this case.

[7] Tr. B at 369. Customs Agent Kresock's credibility was reduced by derogatory statements he made concerning the credibility of Southeast Asian businessmen. In Agent Kresock's words, "I would say I have experience with the Taiwanese people or Taiwanese businessmen of a high reluctance to cooperate and provide factual information." Tr. B at 381. Based on the above, the Court perceives a distinct bias in the testimony of Special Agent Kresock.

[8] Kellmer's testimony was inconsistent with his own testimony and with other witnesses. For example, Kellmer testified that he relied on Def. Exhs. 5, 6 and 7 to determine that the albums were made in Korea. Tr. B at 212–13. However, he later stated that he "disagreed" with each of those documents, and *did not* rely on them. Tr. B at 215–17. Much of Kellmer's testimony was unsupported speculation, that was disproved by plaintiffs evidence.

E. *Plaintiff Overcame the Presumption That the PRC Albums Were Produced in Korea:*

Plaintiff successfully overcame the presumption of correctness attaching to the original ruling that the PRC albums were made from Korean parts, by showing that the substructure beneath the original ruling, and the jerk test which was utilized in an attempt to show the origin of the album pages, were defective. Without the jerk test, Customs had only the most circumstantial evidence that the albums or pages were not actually produced in the PRC. If government witnesses could not ascertain the difference between Taiwanese pages and Korean pages at trial, the Court fails to see how they could determine that the PRC albums contained Korean-produced pages. The government failed to carry the burden of proof once the presumption of correctness was overcome, and it can no longer exclude the PRC albums. Plaintiffs witnesses were unimpeached in their assertions that the Perfect Leatherware albums were produced entirely in the PRC. *See, S. Stern, Henry & Co. v. United States*, 64 Cust. Ct. 1, C.D. 3995, 308 F. Supp. 712, 716 (1970). The Court finds that the Perfect Leatherware albums imported by MBI were properly marked as to country of origin.

F. *Substantial Transformation:*

MBI admits that Three Leaf imported a small percentage of the Korea-made album pages, but argues that those pages underwent a substantial transformation when made into albums using Taiwanese covers, binders and labor. The government argues that the albums were entirely Korean because it proved at trial that the binders on at least some the albums seized were made in Korea. This, coupled with the evidence that a majority of the imported pages were allegedly made in Korea shows, according to their argument, that there was only assembly, not substantial transformation in Taiwan.

Even if the pages were all produced in Korea the albums would be correctly marked if they were "substantially transformed" in Taiwan. Substantial transformation occurs when articles "lose their identity as such and become new articles having * * * a new name, character and use." *Koru North America v. United States*, 12 CIT 1120, 1126, 701 F. Supp. 229, 234 (1988) (citing *United States v. Gibson-Thomsen Co.*, 27 CCPA 267, 270, C.A.D. 98 (1940)), *cf.* 19 C.F.R. sec. 134.35 (1991). Any Korean magnetic pages were substantially transformed in Taiwan and the PRC when they were incorporated into photo albums. The name criterion is satisfied by the change from magnetic page to photo album. The character of the pages was transformed from refills (the only suitable purpose for loose pages) into a fully salable photo album. The use of the pages was also transformed from loose refill pages to completed albums suitable for display on a customer's bookshelf, the primary purpose of a photo album. The combination of the various parts (cover, pages, binder and label) results in an item having a new identity. *See, Carlson Furniture Industries v. United States*, 65 Cust. Ct. 474, C.D. 4126 (1970)

(Chair parts assembled and fitted together transformed into a new functional whole).

*Uniroyal, Inc. v. United States*, 3 CIT 220, 542 F. Supp. 1026 (1982), held that substantial transformation did not occur when shoe uppers were stitched to outsoles. The uppers were already "a substantially complete shoe." *Uniroyal*, 3 CIT at 224, 542 F. Supp. at 1029. The uppers were the essence of the shoes and did not lose their identity in the final manufacturing process. *Id.* The facts in this case show that the pages are not the essence of the photo albums, and that the pages lost their identity when incorporated into the albums.

*Uniroyal* also looked at the value added to the item when transformed. *Uniroyal*, 3 CIT at 225, 542 F. Supp. at 1029. Three Leaf and Perfect Leatherware increased the value of the pages substantially by incorporating them into albums. The ORR ruling failed to take into account the substantial manufacturing and additional raw materials which were added to the albums in Taiwan. Taiwanese labor added approximately 45 % to the value of the albums. Def. Exh. 8; Tr. B at 102. The process of making the album covers is very labor—and raw material-intensive. The pages were made on automatic machines which required less labor to operate than the covers. Tr. A at 95–96. The amount of value added supports the conclusion that the photo album pages were substantially transformed.

## H. *The Guilty Plea:*

MBI was able to show that the guilty plea it entered in a hearing in the District Court for the District of New Jersey, was compelled and coerced by the actions and statements of the Customs Special Agents who investigated and later prosecuted the claim against MBI. Indeed, in the hearing the District Judge was initially unwilling to accept the plea because he felt that it was not being made voluntarily. Def. Exh. 24, at 15–16. The Judge's suspicions were correct; MBI was able to show that the Customs agents threatened MBI with bankruptcy if they did not agree to the plea, and also made threatening gestures and otherwise comported themselves in a threatening manner. Mr. Leykin's testimony, at trial and at a later hearing, about the actions of Customs officials was credible and compelling. This pattern of conduct was continued during the proceedings before this Court, when the government attorney repeatedly badgered Mr. Leykin in an attempt to get him to state that he perjured himself when making the guilty plea.

Although the guilty plea could have arguably been used to *collaterally estop* MBI from claiming that the albums were made in Taiwan,[9] the guilty plea and transcript of the hearing before District Judge Brotman were offered not "as proof of country of origin of particular merchandise in this case, but simply as bearing on the creditability of the evidence

---

[9] The Court ruled on February 28, 1989 that the government could not amend its answer to include *collateral estoppel* and *res judicata* defenses, due to delay by the government and unfair prejudice to the plaintiff.

presented on behalf of MBI and its witnesses." Tr. B at 69. The Court has taken Mr. Leykin's nominally contradictory statements (in widely differing contexts) into account and finds that the guilty plea was coerced by the Customs Service, and does not bear on Mr. Leykin's truthfulness or credibility before this Court.

CONCLUSION

Because the facts supporting the ruling that the MBI albums were produced in Korea, and because a Customs Service agent and the government's expert testified that they could not tell what country the album pages were made in based solely on the "jerk" test, the Customs Service's presumption of correctness has been overcome. Plaintiff has demonstrated that the album pages were properly marked as to countries of origin.